ADOLF SCHWARCZ, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 48795. Filed July 22, 1955.

*Isidore R. Tucker, Esq.*, for the petitioner.
*Maurice E. Stark, Esq.*, for the respondent.

736

OPINION.

ARUNDELL, *Judge:* The basic question in this case is whether and to what extent petitioner is entitled to a net operating loss deduction for the fiscal year ended September 30, 1944.

Petitioner contends that by reason of war losses sustained in the fiscal year 1942 he had a net operating loss for that year, a part of which he seeks to carry forward to his fiscal year 1944.

Respondent disallowed the losses carried forward in their entirety and relies on several alternative grounds in support of his action. It is respondent's initial contention that as a matter of law, war losses within the meaning of section 127 [1] of the Internal Revenue Code of

---

[1] SEC. 127. WAR LOSSES.

(a) CASES IN WHICH LOSS DEEMED SUSTAINED, AND TIME DEEMED SUSTAINED.—For the purposes of this chapter—

\* \* \* \* \* \*

(2) PROPERTY IN ENEMY COUNTRIES.—Property within any country at war with the United States, or within an area under the control of any such country on the date war with such country was declared by the United States, shall be deemed to have been destroyed or seized on the date war with such country was declared by the United States.

(3) INVESTMENTS REFERABLE TO DESTROYED OR SEIZED PROPERTY.—Any interest in, or with respect to, property described in paragraph (1) or (2) (including any interest represented by a security as defined in section 23 (g) (3) or section 23 (k) (3)) which becomes worthless shall be considered to have been destroyed or seized (and the loss therefrom shall be considered a loss from the destruction or seizure) on the date chosen by the taxpayer which falls between the dates specified in paragraph (1), or on the date prescribed in paragraph (2), as the case may be, when the last property (described in the applicable paragraph) to which the interest relates would be deemed

1939, can never be attributable to the operation of a trade or business regularly carried on and that they necessarily fall within the limitation on net operating losses set forth in section 122 (d) (5) [2] of the Internal Revenue Code of 1939.

Respondent's reasoning, while elaborate and complex, boils down to the theory that section 127 losses should be treated in exactly the same manner for tax purposes as casualty losses within the meaning of section 23 (e) (3) [3] of the Internal Revenue Code of 1939. Respondent quotes from Regulations 111, section 29.127 (a)–1, as follows:

Section 127 (a) and (e) provides that the property and investments described above shall be treated as being "destroyed or seized" * * *, and this loss of such property rights is deemed to be sustained by reason of a casualty. * * *

Respondent also quotes from S. Rept. No. 1631, 77th Cong., 2d Sess., where, under section 158, designated "War Losses," it was stated:

It is a matter of conjecture as to what condition the property will be in at the termination of the war. Accordingly, such property is treated as lost upon the date war is declared, and, in view of the nature of this loss, it is treated in the same manner as other casualty losses, that is, as a loss from the destruction or seizure of the property.

Respondent argues that since the word "casualty" when used in reference to losses appears only in subsection 23 (e) (3) of the Internal Revenue Code of 1939, which subsection is limited to nonbusiness losses, Congress obviously intended that war losses should be placed in the category of nonbusiness losses without regard to whether the assets presumed to have been seized or destroyed are business assets or not.

---

destroyed or seized under the applicable paragraph. This paragraph shall apply only if the interest would have become worthless if the property had been destroyed. For the purposes of this paragraph, an interest shall be deemed to have become worthless notwithstanding the fact that such interest has a value if such a value is attributable solely to the possibility of recovery of the property, compensation (other than insurance or similar indemnity) on account of its destruction or seizure, or both.

[2] SEC. 122. NET OPERATING LOSS DEDUCTION.

(a) DEFINITION OF NET OPERATING LOSS.—As used in this section, the term "net operating loss" means the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d).

* * * * * *

(d) EXCEPTIONS, ADDITIONS, AND LIMITATIONS.—The exceptions, additions, and limitations referred to in subsections (a), (b), and (c) shall be as follows:

* * * * * *

(5) Deductions otherwise allowed by law not attributable to the operation of a trade or business regularly carried on by the taxpayer shall (in the case of a taxpayer other than a corporation) be allowed only to the extent of the amount of the gross income not derived from such trade or business.

[3] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(e) LOSSES BY INDIVIDUALS.—In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

* * * * * * *

(3) of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty, or from theft. * * *

We are of the opinion that such an interpretation is wholly unwarranted. Obviously a war loss is a casualty loss in the sense that it is conclusively presumed to have arisen from a casualty, namely, the destruction or seizure of the property by an enemy of the United States. Where reference is made to war losses being in the nature of casualty losses, we think the intention is clearly to use the word "casualty" in that context.

Section 23 (f) which deals with losses by corporations provides for the deduction of "losses sustained during the taxable year and not compensated for by insurance or otherwise." There is no question of a loss being personal to a corporation as is the case where losses by individuals are concerned. If a corporate asset is destroyed by fire or flood or other casualty, the loss is deductible under section 23 (f). *Ticket Office Equipment Co.*, 20 T. C. 272, affd. 213 F. 2d 318; *Harris Hardwood Co.*, 8 T. C. 874.

Similarly, where an individual suffers a loss connected with his trade or business he can deduct that loss under section 23 (e) (1), even though the loss is caused by an event in the nature of a casualty, and the respondent has so ruled. See O. D. 367, 2 C. B. 58, which speaks of a net operating loss sustained on account of flood losses; I. T. 1808, II-2 C. B. 36 (fire loss); I. T. 3921, 1948-2 C. B. 32 (freeze, hurricane, or other casualty). See also the recent case of *Reiner* v. *United States*, 222 F. 2d 770, where it was held that damage to rental property as a result of bombing gave rise to a loss attributable to a trade or business and capable of being carried forward.

There appears to be no justification for restricting war losses to property not connected with a trade or business. Clearly Congress had no such intention. Congress was aware that taxpayers would have great difficulty in determining or establishing the actual facts regarding assets in combat zones and territory occupied by enemies of the United States. The purpose of section 127 is clear. It fixes the dates on which losses are presumed to have occurred.

We have held that war losses must be taken at the time they are "deemed" by section 127 to have occurred. Therefore, under the facts here present, the loss must be taken in 1942, or not at all. *Abraham Albert Andriesse*, 12 T. C. 907; *Ezra Shahmoon*, 13 T. C. 705, affd. 185 F. 2d 384. To say that a loss of business property deemed to have occurred under section 127 may not be taken into consideration in determining net income because the property may not in fact have been destroyed would be to construe a statute designed to give relief so as to deny the very relief the statute intended.

It is interesting to note that in the Revenue Act of 1951 Congress amended section 122 (d) (5) so as to permit losses to be taken into consideration in full in computing the net operating loss deduction "if the losses arise from fire, storm, shipwreck, or other casualty, or from

theft." This language is clearly borrowed from section 23 (e) (3) and it is manifest from the committee reports that Congress intended to enlarge the coverage of section 122 so as to enable individuals to take into consideration for carry-forward and carry-back purposes not only losses attributable to a trade or business, but also losses of nonbusiness property by casualty. See H. Rept. No. 1213, 82d Cong., 1st Sess. (1951), p. 86.

Respondent argues alternatively that even if war losses are of a type which may qualify as business losses, petitioner has failed to show that any of the claimed losses were in fact attributable to a trade or business regularly carried on by him within the meaning of section 122 (d) (5) of the Internal Revenue Code of 1939. As to the operation of the Terez and Dob properties, we think respondent is in error.[4]

We take it to be well settled that the operation of even a single parcel of rental realty may constitute the regular operation of a business. In *Anders I. Lagreide*, 23 T. C. 508, 511, we said:

The first issue to be considered is whether or not the renting out in 1949, by Alice Lagreide, of a single piece of residential real estate, amounted to the operation by her of a trade or business regularly carried on. She inherited the property from her mother in 1948 and never occupied or maintained it as her own residence. Since the time of the mother's death, the property was either rented or available for renting, and was actually rented during part of 1948 and almost all of 1949.

It is clear from the facts that the real estate was devoted to rental purposes, and we have repeatedly held that such use constitutes use of the property in trade or business, regardless of whether or not it is the only property so used. *Leland Hazard*, 7 T. C. 372 (1946). See also *Quincy A. Shaw McKean*, 6 T. C. 757 (1946) ; *N. Stuart Campbell*, 5 T. C. 272 (1945) ; *John D. Fackler*, 45 B. T. A. 708, 714 (1941), affd. (C. A. 6, 1943) 133 F. 2d 509. We add that the use of the property in trade or business was, upon the facts, an operation of the trade or business in which it was so used (see *Industrial Commission* v. *Hammond*, 77 Colo. 414, 236 Pac. 1006, 1008). It is clear, also, that the business was "regularly" carried on, there having been no deviation, at any time, from the obviously planned use.

The fact that the taxpayer operates the rental property through an agent does not prevent him from being regularly engaged in the business. *Gilford* v. *Commissioner*, 201 F. 2d 735, affirming a Memorandum Opinion of this Court. And the rule applies even though the property and the agent are in a foreign country (Austria). *Reiner* v. *United States, supra.*

The record shows that petitioner actively managed the properties prior to his departure for the United States and that he was in frequent contact with his partner who managed the properties after petitioner left. We are of the opinion, accordingly, that petitioner

---

[4] Our finding that petitioner had no interest in the Andrassy property precludes any further consideration of losses attributable thereto.

was regularly engaged in the business of operating the Terez and Dob properties on June 5, 1942.

As to the account receivable by petitioner from the corporation in the amount of 45,000 pengoes, we are convinced that petitioner sold certain watches of that value to the corporation and we think it clear that there is no question of a capital contribution involved as respondent suggests there may be.

We think it equally clear that the loss of the account receivable was attributable to petitioner's individual jewelry business. The debt arose as a part of an ordinary business transaction wherein petitioner sold some watches to the corporation. If the corporation had refused or been unable to pay, there would have been no question but that petitioner's loss was attributable to his business. Here, petitioner's loss stems not from the corporation's inability to pay but from the presumed seizure of the corporation and its assets by an enemy power. The fact that the physical cause of a loss is extrinsic to the business does not preclude the treatment of the loss of a business asset as a business loss. Cf. O. D. 367, I. T. 1808, and I. T. 3921, *supra*.

The fact that petitioner was no longer in the business at the time of the presumed seizure does not require a different result so long as the loss results from and is proximately related to the operation of the trade or business previously engaged in. *Edgar L. Marston*, 18 B. T. A. 558, affirmed sub nom. *Burnet v. Marston*, 57 F. 2d 611; *Walter G. Morley*, 8 T. C. 904.

Respondent contends further, however, that if the item is deductible at all as a war loss, it is deductible under section 127 (a) (3) which deals with investments referable to destroyed or seized property rather than under section 127 (a) (2) which deals with property in enemy countries and enemy controlled areas. From that point, respondent argues that under the regulations applicable to section 127 (a) (3) petitioner is required to prove destruction of the underlying assets of the corporation.

The record does not justify a conclusion that the corporation owned assets outside of Hungary, and no such question was suggested by the pleadings or in respondent's opening statement at the time of trial. As all of the assets in Hungary are deemed to have been destroyed or seized as of June 5, 1942, under section 127 (a) (2), it follows that the accounts receivable are deemed lost and are, therefore, deductible.

As to the gold, silver, diamonds, and watches left in the office safe and bank vault for safekeeping, we think respondent is correct in his contention that any losses based thereon were not attributable to any trade or business and are, therefore, within the exclusion provided in section 122 (d) (5). The record discloses that upon his departure for the United States in 1939 petitioner ceased to operate his individ-

ual jewelry business in Budapest and placed his unsold inventory in a bank vault and office safe, entrusting its safekeeping to business associates and relatives. Petitioner gave instructions that the articles were not to be sold or disposed of but were to be protected until petitioner's return. The properties were remnants of his former business which he might have disposed of or handled in various ways during the intervening years. No business reason for the delay in disposition appears. The mere fact that he allowed the property to remain in storage until the declaration of war does not relate the loss sufficiently to his former business to make it an operating loss of that business. The loss is too remote from, and unrelated to, the prior business to be regarded as resulting from the operation of that business.

When petitioner left for the United States in April 1939, there apparently was considerable doubt in his mind as to whether he would ever return to Hungary. In early 1940, petitioner and his wife definitely resolved to remain in the United States permanently.

We find no merit in petitioner's contention that the losses may be attributed to the business conducted by him in this country after March 1940.

A subsidiary question is raised as to the extent of the loss attributable to the 3 parcels of real property. The Andrassy property was purchased and held in the names of the wives of Adolf Schwarcz and Odon Vogel. One-half of the interest in the name of petitioner's wife was transferred in 1933 to petitioner's daughter. It is respondent's position that petitioner has not shown that he is entitled to any loss on that property.

With respect to the other 2 properties, one-half of each was listed in the Hungarian Ground Register to petitioner and his wife, the other one-half of the property being listed to Odon Vogel and his wife. As to those properties, respondent's view is that petitioner's loss must be limited to a one-fourth interest.

We think respondent's position is well taken. The petitioner's self-serving and uncorroborated statement that the properties were his alone and not in part his wife's might be accepted, under the circumstances, if there were no contradictory evidence, but we are unwilling to accept it as better evidence of the ownership than the official records of Hungary, which show that his wife had an interest in the properties.

A further question is raised as to the amount of the losses attributable to the real property. Respondent contends that the losses must be restricted to a computation based only on the stipulated cost and depreciation figures. In support of his contention, respondent characterizes the testimony of petitioner regarding amounts expended for additions, improvements, and other capital items as vague and uncor-

roborated. While it is true that the evidence on this point is not all that might be desired, nevertheless, we are satisfied that some expenditures were made. Petitioner testified to the best of his recollection in stating maximum and minimum amounts between which he was certain the actual expenditures fell, and in our Findings of Fact, we have allowed only the minimum amounts testified to in each instance.

The parties have stipulated the rates to be used in translating Hungarian pengoes into United States dollars. This matter is left, therefore, for the Rule 50 computation.

*Decision will be entered under Rule 50.*