PETER S. ELEK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 65092.    Filed June 26, 1958.

*Isidore I. Tucker, Esq.*, for the petitioner.
*Norman L. Rapkin, Esq.*, for the respondent.

TIETJENS, *Judge:* The respondent determined deficiencies in income tax of 83 cents for 1953 and $496 for 1954. The sole issue is whether the petitioner is entitled to a net operating loss carryover deduction for these years based upon a loss sustained in 1952 due to nationalization by the Hungarian Government of rental property of the petitioner.

Some facts are stipulated.

FINDINGS OF FACT.

The petitioner's return for 1953 was filed with the district director of internal revenue at Philadelphia; his return for 1954 with the district director of internal revenue, Upper Manhattan, New York.

The stipulated facts are incorporated by this reference.

The petitioner is a resident of New York, New York, and is a citizen of the United States naturalized in 1956. He was a Hungarian national, a graduate of the University of Budapest and did graduate work in Cambridge, England. He was an economist in Hungary and worked for a cooperative.

In November 1942, he acquired an apartment house at Horthy Miklos Road 4 in Budapest for which he paid 460,000 pengos. This building contained 3 stores on the ground floor and 15 apartments on 5 upper floors.

In 1942 100 pengos were exchangeable for 104.25 Swiss francs, and one United States dollar was worth 4.3 Swiss francs.

The petitioner rented the stores and apartments to tenants and managed the property himself in addition to working for the cooperative. He supervised the maintenance and kept up the air raid shelters during the war. He had a janitor on the premises.

The petitioner left Hungary in December 1948, and came to the United States in 1950.

The petitioner's father managed the apartment after 1948. He was owner of a farm some 30 miles from Budapest and owned and managed other apartment buildings. He resided in Budapest. The petitioner corresponded with his father from time to time about the petitioner's property.

In 1952 the petitioner received word from his father that the petitioner's property had been confiscated by the Hungarian Government.

The Hungarian Government by Decree No. 4 of 1952 provided, as translated:

*Article 1*

1) The following shall be nationalized on the strength of the present statute Decree together with their component parts and appurtenances:

a) all privately owned buildings (apartment-houses, villas, business houses, factories, stores, etc.) which, or certain parts of which, are being utilized under lease;

b) buildings owned by capitalists, other exploiting elements and the elements belonging to the overthrown social order who oppressed the people, including cases where the building is not leased.

The basis of the property to the petitioner in 1952 was $64,000.

OPINION.

The petitioner contends that his property in Budapest was confiscated without compensation by the Hungarian Government in 1952

and that he sustained a loss arising out of a trade or business and is entitled to a loss carryover to 1953 and 1954 pursuant to sections 23 (s) and 122 of the Internal Revenue Code of 1939.[1]

The petitioner claimed the loss for 1952 in an amended return filed in 1954 and claimed it as a business loss in a second amended return filed in 1955. In 1956 the district director of internal revenue allowed the claimed loss as a business loss in 1952.

The respondent determined that the petitioner did not sustain a net operating loss in 1952 which could be carried over into 1953 and 1954.

The circumstance that the district director allowed the loss in 1952 does not bar the respondent from making a redetermination or reversing that position. *Bonwit Teller & Co.* v. *Commissioner*, 53 F. 2d 381 (C. A. 2, 1931); *McIlhenny* v. *Commissioner*, 39 F. 2d 356 (C. A. 3, 1930).

The respondent contends that the petitioner has not proved that he sustained a loss in 1952, or that he was unable to secure compensation for the alleged loss, or the value of the property lost measured in United States dollars and that the alleged loss is neither attributable to a trade or business or to a casualty.

The rental and management of an apartment building or residential property amounts to a trade or business of the owner, and this is true where an agent acts for the owner. *Gilford* v. *Commissioner*, 201 F. 2d 735 (C. A. 2, 1953), affirming a Memorandum Opinion of this Court; *Reiner* v. *Commissioner*, 222 F. 2d 770 (C. A. 7, 1955). See *Adolph Schwarcz*, 24 T. C. 733 (1955), acq. 1956–1 C. B. 5. This property was actively managed by the petitioner until he left Hungary and by his father as his agent thereafter. Thus the petitioner was engaged in a trade or business.

A copy of the deed is in evidence and a translation of it shows that the petitioner purchased a property with improvements for 460,000 pengos. There was no official exchange between pengos and dollars in 1942 but both were exchangeable for Swiss francs and the rates of such exchange are in evidence. From this it appears that the investment in 1942 was in excess of $100,000.

The property was described by a witness who has been in the building. This witness was an appraiser for the Hungarian Ministry of Finance and for the Hungarian Association of Insurance Companies prior to 1947. He expressed the opinion that 25 per cent of the cost

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \* \*

(s) NET OPERATING LOSS DEDUCTION.—For any taxable year beginning after December 31, 1939, the net operating loss deduction computed under section 122.

SEC. 122. NET OPERATING LOSS DEDUCTION.

(a) DEFINITION OF NET OPERATING LOSS.—As used in this section, the term "net operating loss" means the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d).

should be allocated to the land, and 75 per cent to the building and that depreciation for the period 1942 to 1952 would be at the rate of 1 per cent per year. We consider this depreciation rate entirely inadequate. Applying a more realistic depreciation rate for the 10 years we find the depreciated basis to the petitioner was $64,000 in 1952.

The respondent contends that the petitioner has not proved that the property was confiscated or that he is unable to secure compensation from the Hungarian Government. The petitioner testified that he received word from his father that this property was confiscated. The Hungarian Decree No. 4 of 1952 issued February 17, 1952, declared nationalized certain properties, including apartment houses, and also buildings owned by capitalists. A translation of this supplied by the Department of State is in evidence. Although the decree provides that the nationalization "shall be effected against compensation," the petitioner has received no compensation or offer of compensation. The taxpayer is not required "to be an incorrigible optimist." *United States* v. *White Dental Mfg. Co.*, 274 U. S. 398 (1927). The attitude of the present Hungarian Government toward its own nationals offers little reason to hope that compensation will be forthcoming from it.

We find that the petitioner sustained a loss of $64,000 in 1952 in connection with a "trade or business" and is entitled to loss carryovers to 1953 and 1954.

*Decision will be entered under Rule 50.*