Madeleine Feiks v. Commissioner.
Feiks v. Commissioner
Docket No. 64793.
United States Tax Court
T.C. Memo 1958-120; 1958 Tax Ct. Memo LEXIS 109; 17 T.C.M. (CCH) 642; T.C.M. (RIA) 58120; June 26, 1958
*109 Nicholas R. Doman, Esq., 521 Fifth Avenue, New York, N. Y., for the petitioner. Colin C. Macdonald, Jr., Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The respondent determined a deficiency in income tax for the calendar year 1953 in the amount of $906. The issue raised in the petition concerns the disallowance of a net operating loss deduction claimed on the return as a carry-over of a loss for the taxable year 1952 resulting from a nationalization of the petitioner's property in Budapest, Hungary, by the Hungarian Government in 1952. The petitioner filed her return with the collector of internal revenue at Brooklyn, New York. Findings of Fact The petitioner is a citizen of the United States, naturalized in 1953 and is a resident of New York City. Her husband died in 1953. Prior to 1948 she was a resident of Budapest, Hungary. In 1940 the petitioner and an associate, Mrs. Gyula Szasz, purchased an apartment building and adjoining grounds at 116 Gizella Ut, in Budapest. The purchase price was 122,500 pengos. A translation of the land record shows: "On the basis of the purchase contract dated February 14, 1940 ownership *110 is recorded in equal parts "Alfred Feiks and wife, nee Magda Bacskar "Mrs. Gyula Szasz, nee Aranka Fenyvesi, Budapest residence." In 1940 the pengo was valued at 0.1977 dollars. The property included a large vegetable garden and was improved by a T-shaped stone building of several stories containing 36 apartments. The petitioner did not live on the property. She managed the property until 1948 and during the war grew vegetables in the garden for sale. In May 1948 the petitioner left Hungary and came to the United States. She authorized a friend, Dr. Vigyazo, to manage the property and had a caretaker on the premises. She corresponded with Dr. Vigyazo about the property. In 1949 a Hungarian decree provided for management by the Hungarian Municipal Realty Property Management Enterprise of properties owned by persons who lived outside Hungary. The proceeds of such properties were kept in a blocked account and could not be withdrawn from Hungary without permission, but could be used within Hungary for purposes of the owner. Pursuant to this decree the petitioner's property was subject to the management of this Hungarian agency from April 1951. In February 1952 the Hungarian *111 Government by Decree #4 of 1952 nationalized all privately-owned buildings, including apartment houses. The petitioner learned of the nationalization of her property by letter from Dr. Vigyazo in April 1952. Such letter stated, as translated: "I am advising you that your property interest in the realty located at Budapest XIV Hungaria Boulevard 116, with an act in the month of April, 1951, of the National Bank, Fe. 85/4/1950, was turned over to the Municipal Realty Property Management Enterprise pursuant to order No. 1310/1949. "I am also advising you that pursuant to subdivision la of paragraph 1 of Edict No. 4 of the year 1952, published on February 17, 1952, the above managed realty interest was nationalized. This was due to the fact that the realty in question was utilized for rental in its entirety." The Decree #4 of 1952 provided, in part, as translated: "Article 1 "1) The following shall be nationalized on the strength of the present statute Decree together with their component parts and appurtenances: "a) all privately owned buildings (apartment-houses, villas, business houses, factories, stores, etc.) which, or certain parts of which, are being utilized under *112 lease; "b) buildings owned by capitalists, other exploiting elements and the elements belonging to the overthrown social order who oppressed the people, including cases where the building is not leased." The petitioner sustained a loss in 1952 of $5,900 from the nationalization of the property in Budapest. Opinion The petitioner reported an adjusted gross income of $4,180 for 1952 and claimed a deduction of $12,000 from the loss of her property in Budapest by nationalization. On her 1953 return she reported income of $4,955 and claimed a net operating loss deduction of $4,070 as a carryover. In a computation attached to the return the loss was claimed to be $12,000 with $4,150 as a deduction for 1952; $3,780 as a carryback to 1951 and $4,070 remaining as a carryover to 1953. The respondent contends that the petitioner has not proved the extent of her ownership interest, that a loss occurred, the amount of the loss or that the loss was attributable to the operation of a trade or business. In Peter S. Elek, 30 T.C. - (June 26, 1958) we allowed a loss carryover claimed by a former Hungarian owner of an apartment property in Budapest which was nationalized by the same decree *113 of 1952. We follow that decision here. This property was managed by the petitioner until 1948 and thereafter by her appointed agent until the management was taken over by the Hungarian Municipal Realty Property Management Enterprise. This agency managed it keeping proceeds in a blocked account usable in Hungary but not withdrawable from that country. To some extent, at least, it was for benefit of the owner as in making repairs to maintain the property. Thus the petitioner was in the business of operating this property until it was nationalized in 1952. Even if she was no longer in the business at the time of the nationalization the loss is still a business loss if proximately related to a business previously engaged in. Adolph Schwarcz, 24 T.C. 733 (1955) Acq. C.B. 1956-1, 5. The total investment in the building was 122,500 pengos. At the rate of exchange in 1940, the pengo equalled 0.1977 United States dollars (Internal Revenue Cum. Bulletin 1941, page 236). The total investment measured in dollars was about $24,000. The petitioner testified that she paid two-thirds of the price and owned a two-thirds interest. The respondent argues that this is contradicted by the *114 Hungarian land register showing equal interests in petitioner, her husband and the other investor, and citing the Schwarcz case, supra, where we held that the taxpayer's uncorroborated statement to the contrary was not to be preferred to the land register. The petitioner testified that her husband was shown as having an interest for the purpose of reducing taxes but that she supplied two-thirds of the purchase price. A witness, familiar with Hungarian law in the 1940's, testified that the register was conclusive against anyone who in good faith acquired rights based upon the title as registered, but that facts to the contrary could be proved. However, we are unwilling to accept the petitioner's testimony as sufficient proof that the register does not correctly show the interests. We conclude that her interest was one-third. The petitioner did not know the age of the property at the time she acquired her interest. The building was of stone and mortar construction. The petitioner did not know the cost of repairs or upkeep after 1948, but says that it was in good physical condition at that time. The depreciation on such a structure for 12 years, 1940 to 1952, could not well have exceeded *115 30 per cent of the investment in the building in 1940. The petitioner had a one-third interest in the land and building which cost her about $8,000. We allocate $1,000 to the land, $7,000 to the building in the absence of better proof and compute depreciation for 12 years at 30 per cent or $2,100. Her basis in the property when confiscated was $5,900. That is the amount of her loss and it is attributable to the operation of a trade or business. The amount of loss carryover in 1953 can be determined in a computation under Rule 50. Decision will be entered under Rule 50.