Tibor Daniel and Sophie Daniel v. Commissioner.
Daniel v. Commissioner
Docket No. 63522.
United States Tax Court
T.C. Memo 1960-274; 1960 Tax Ct. Memo LEXIS 17; 19 T.C.M. (CCH) 1521; T.C.M. (RIA) 60274; December 22, 1960
*17 1. Sophie Daniel was a national and resident of Budapest, Hungary. She owned an interest in rental property there. After her departure in 1948, her interest was managed by an agent. The property was taken by the Hungarian Government by decree in 1952. Held, as a part-owner petitioner was engaged in a trade or business and sustained a net operating loss in the amount determined which may be carried over to 1953. Peter S. Elek, 30 T.C. 731, followed. 2. Tibor Daniel was a national and resident of Budapest. He owned an unimproved lot there. Upon the evidence, held, that he has not proved that he was engaged in a trade or business with respect to such property and assuming that it was taken by the Hungarian Government in 1952, he did not sustain a loss in 1952 within the net operating loss provisions, sections 23(s) and 122 of the 1939 Code, and therefore is not entitled to a net operating loss carryover to 1953. Isadore R. Tucker, Esq., for the petitioners. Norman L. Rapkin, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent determined an income tax deficiency of $864.12 for 1953. With respect to different pieces of real estate located in Budapest, Hungary, each petitioner claims a net operating loss in 1952 with carryovers to 1953. The questions are whether each property was taken in 1952 by the Hungarian Government, and whether each taxpayer was engaged in a trade or business with respect to each property so that a net operating loss was sustained which can be carried over to 1953, and, if so, the amounts of the losses. Findings of Fact The petitioners reside in Rego Park, Long Island, New York. They filed their joint return for 1953 with the district director of internal revenue for the first district of New York in Brooklyn, New York. The return was made on a cash basis. Sophie Daniel, born in Hungary in 1914, was a resident of Budapest, *19 Hungary, and became a resident of Paris, France, where she was married, in 1949, to Tibor Daniel, also a Hungarian who had left Budapest. They came to the United States in December 1949, where they have lived continuously without taking any return trip to Hungary. Both are naturalized citizens of the United States, and have resided in the New York City region where they have been employed. They filed joint income tax returns for 1951, 1952, and 1953. Tibor Daniel was born in Hungary in 1908; he was a resident of Budapest; he left Hungary in July 1948, and thereafter he lived in Paris until December 1949. The Hungarian Government issued a decree in 1952, Decree No. 4, by which certain improved kinds of real property were nationalized, i.e., taken over by the Government. The decree, in general, refers to houses and buildings. The decree provided in part, as translated, as follows: (1) The following shall be nationalized on the strength of the present statute Decree together with their component parts and appurtenances: (a) all privately owned buildings (apartment-houses, villas, business houses, factories, stores, etc.) which, or certain parts of which, are being utilized under *20 lease; (b) buildings owned by capitalists, other exploiting elements and the elements belonging to the overthrown social order who oppressed the people, including cases where the building is not leased. Sophie Daniel On October 16, 1943, Sophie acquired by inheritance from her mother a 25 per cent interest in an apartment house property and the land located at 40 Vilmos Csazar Ut in a business section of Budapest. Shortly after, she sold a 10 per cent interest to her sisters. She retained a 15 per cent interest. The building is a seven story structure built of reinforced concrete, centrally heated, and equipped with elevator. It contains 24 rental apartments on 6 floors and 4 rental stores on the ground floor. It was constructed in 1936 by Sophie's mother. The other coowners of the property were Sophie's 1936 by Sophie's mother. The other co-owners of the property were Sophie's brother and two sisters who owned an undivided 85 per cent interest after acquiring a 10 per cent interest from Sophie. In October 1943, the fair market value of the apartment property was 800,000 pengos, of which 200,000 pengos was allocable to the land, and 600,000 pengos was allocable to the building. *21 In 1943, 100 pengos were exchangeable for 104.25 Swiss francs, and 4.297 Swiss francs were exchangeable for one United States dollar. During the period from October 16, 1943, the date of inheritance, to February 17, 1952, the date of the Hungarian decree of nationalization of certain kinds of improved real estate, the Vilmos apartment building was entirely rented to tenants and was not used personally by the owners. Sophie received or was credited with her share of the net income of the property. From October 16, 1943, until sometime in 1948, when Sophie, her brother, and one sister left Hungary, the property was managed by Sophie, her brother, and the other co-owners, and their agents. During the period 1948 to February 17, 1952, after petitioner, her brother, and one sister left Hungary, the property was operated and managed by the sister who remained in Budapest and by an agent of Sophie, her former husband, Bela Weldy, a lawyer in Budapest. Sophie made arrangements with Weldy before her departure to have him act as her agent in the management of the property and collect her share of the rents. She has corresponded with Weldy more or less continuously since she left in 1948, *22 and such communications have included information about the Vilmos property. In 1952, Sophie received word from Weldy that the apartment property had been confiscated by the Hungarian Government. The adjusted basis to Sophie of her 15 per cent interest in the Vilmos property in 1952 was $25,329. She sustained a net operating loss in that amount in 1952. Tibor Daniel Daniel's professions in Budapest were the law and banking. He was admitted to the Bar in 1941 and practiced law. He also was employed by a bank owned by the Hungarian Government, and at one time he was in its foreign currency and exchange department. His employment by the bank ended in 1946 when the Communists gained control of the Government. He received an inheritance from his mother and he accumulated money from his law practice and other sources. He was and now is employed by the Bank of America in New York City. In 1943, Daniel purchased an unimproved lot located on a street, Nagy Szollisi Ut, in Budapest, the total cost of which was 66,000 pengos, of which the purchase price was 60,000 pengos and the acquisition expenses were 6,000 pengos. Daniel did not construct any building or improvements on the lot. *23 The lot was not held by Daniel in a trade or business. He was not engaged in any trade or business involving real estate, properties, or the Nagy lot. He did not sustain any net operating loss in 1952. Opinion Issue 1, Sophie Daniel: The petitioner contends that the Vilmos Apartment building in which she owned an undivided interest was confiscated without compensation in 1952 by the Hungarian Government, that she sustained a loss arising out of a trade or business, and that she is entitled to a net operating loss carryover to 1953 under sections 23(s) and 122 of the 1939 Code. Under somewhat similar facts it has been held that where a taxpayer was engaged in a business, while he was in Hungary, consisting of the operation and management of rental property located in Hungary, and such business was carried on by his agent after he departed, and the business property was confiscated without compensation by the Hungarian Government under the nationalization decree of February 17, 1952, which is involved here, the loss sustained comes within section 23(s) and 122 and may be carried over from the year in which the loss was sustained. See Peter S. Elek, 30 T.C. 731, in *24 which the Commissioner has acquiesced, 1958-2 C.B. 5. The rule of the Elek case applies here, so that only questions of fact are presented. The Findings of Fact dispose of the issue raised by the petitioner, Sophie Daniel, who has established, under her burden of proof, that she owned an interest in business property in Budapest, that she and the co-owners operated and managed the property, that her agent acted for her in such activities after her departure, that therefore she was engaged in a business with respect to the property, that the property was confiscated in 1952 without compensation, and that she sustained a loss in 1952 in the amount of $25,329. It is concluded that petitioner is entitled to a loss carryover to 1953. The parties are agreed that the amount of the carryover is to be computed under Rule 50 on the basis of our determinations. Gilford v. Commissioner, 201 F. 2d 735; Reiner v. Commissioner, 222 F. 2d 770; Adolph Schwarcz, 24 T.C. 733, acq. 1956-1 C.B. 5. The evidence has been fully considered and we are satisfied that it support the petitioner's claims. The petitioner called as a witness *25 an appraiser who had been a member of the City Planning Board of Budapest, who had been an appraiser for the National Federation of Insurance Companies in Hungary and the Hungarian Ministry of Finance, and was familiar with the nature of the construction of the Vilmos property. He had been acquainted with petitioner's mother and brother, Baron George Torney, and was also well acquainted with the apartment property. He expressed the opinion that the value of the entire property on October 16, 1943, the date of inheritance, was 800,000 pengos of which 25 per cent was allocable to the land and 75 per cent to the building. The rate of depreciation which he applied for annual depreciation of the particular construction is reasonable and adequate. The adjusted basis of the building as of February 17, 1952, has been correctely computed, in our opinion. The petitioner had the burden of proving in terms of United States dollars the basis of the inherited apartment property in 1943, depreciation over a period of 8 2/3 years, and the amount of her loss. She employed the same means of proving the dollar amounts involved as was used in the Elek case, namely, the 1943 rate of exchange of pengos *26 for Swiss francs and of the latter for United States dollars. As in the Elek case, that proof is deemed adequate here under all of the circumstances. Cf. Wm. E. Reisner, 34 T.C. -, (September 27, 1960). The respondent contends that petitioner has not proved that the apartment property was confiscated in 1952 or that she was unable to secure compensation from the Hungarian Government. There is in evidence a State Department translation of Decree No. 4, issued by that Government on February 17, 1952, which declared the nationalization of certain types of improved properties, including apartment houses, owned by "capitalists". The property owned by petitioner and her co-owners comes within the scope of the Decree. Petitioner, a sister, and their brother left Hungary before 1952. The petitioner testified that she received word from her agent, a lawyer in Budapest, that the property was confiscated in 1952 under the decree, and that no compensation for the property has been paid by the Hungarian Government. Under the rules of the Elek case and United States v. White Dental Mfg. Co., 274 U.S. 398, the petitioner is not required to be overly optimistic about the possibility *27 that compensation for the property will be paid. We find that petitioner sustained a loss in the amount of $25,329 in connection with a trade or business and is entitled to a loss carryover to 1953 under sections 23(s) and 122. Issue 2, Tibor Daniel: Daniel contends, with respect to the Nagy Street lot, that he sustained a loss arising out of a trade or business in 1952, and that the loss was brought abount by the confiscation of his property by the Hungarian Government in 1952 under the decree of February 17, 1952. He now claims that the total amount of the loss in 1952 was 366,000 pengos, or $88,791. The dollar amount of the alleged loss has been computed by the petitioner on the basis of the rate of exchange in 1943 of pengos for Swiss francs (100 pengos for 104.25 Swiss francs), and the exchange rate of Swiss francs for United States dollars in the same year (4.297 Swiss francs for one dollar). In an amended return for 1952, in his 1953 return, and in claims for refund filed by Daniel and his wife, Daniel consistently claimed a loss from the alleged confiscation of a lot only. In the amended petition filed in this case, Daniel claimed for the first time a loss in 1952 of *28 300,000 pengos which he alleges was paid on March 9, 1943, under a contract to have an apartment building constructed on the lot. The total amount of the loss now claimed has been computed by Daniel in the following way: Cost of lot, 66,000 pengos
$16,011
Basis of building contract, 300,000
pengos
72,780
$88,791
Daniel claims that on March 9, 1943, he purchased a lot from Stephen Szilard, a building contractor, and at the same time entered into a contract with him to have an apartment building constructed on the lot within one year from the date of the contract; that he paid Szilard 300,000 pengos at that time, in advance, for the construction of the building, and Szilard agreed to put up the building for that amount. He claims, further, that Szilard drew up blueprints for the building but, in about May 1943, requested an indefinite extension of time for starting construction because of a shortage of building materials. The building was never constructed and construction was never started. Daniel's explanation is, further, that from the time the Germans invaded Hungary in 1944 until the end of actual warfare in Hungary around February 18, 1945, the construction *29 of the building could not be undertaken; that in 1945, he and Szilard went to Switzerland to look for building materials, but did not get them; that he gave the contractor an extension of time to put up the building by the end of 1946; that in 1947, both Daniel and Szilard were imprisoned by the Communists; and that Daniel left Hungary in July 1948, soon after he was released from prison. Daniel also asserts that Szilard did not return all or any part of the 300,000 pengos, and did not pay any interest. He testified that he did not institute any legal proceeding against Szilard to recover the money. He also testified that he rented the lot for about one year, from about June 1943 until July 1944, to a person who used it for growing vegetables and flowers, but that thereafter it was not rented and no use was made of the lot. Daniel testified further that when he left Hungary he asked another lawyer, Weiss, to look after his interests in the lot and in general, and that Weiss notified him by a letter that the lot was taken by the Hungarian Government in 1952. Daniel relies solely upon his own testimony about the above allegations. He did not produce any building contract with Szilard *30 or any evidence of payment of 300,000 pengos to him, apart from his own testimony. He did not produce any letter from Weiss. The nationalization decree of February 17, 1952, was shown to Daniel during his testimony, and he testified that his unimproved lot was covered by the decree because he understood the decree to mean that the Government was "taking away your property". Daniel produced translation of a transcript of entries in the Real Properties Register in Budapest, showing the ownership of the lot in question on Nagy Street. The transcript was made on January 9, 1957; Daniel received it in 1957 from a lawyer in Budapest. The transcript shows the recording on March 17, 1943, of a contract of sale dated March 9, 1943, of a lot to Tibor Daniel for 60,000 pengos. The transcript does not show the recording of any building contract. We find that Daniel purchased a lot in Budapest in 1943, and that the total cost was 66,000 pengos, which includes acquisition costs of 6,000 pengos. Petitioner's evidence about the alleged confiscation of the lot is not clear, and it is our opinion that he only has assumed that Decree No. 4, issued on February 17, 1952, nationalizing certain kinds *31 of improved property, applied to unimproved lots. The translation before us declares the nationalization of "privately owned buildings (apartmenthouses, villas, business houses, factories, stores, etc.), and "buildings owned by capitalists." The preamble of the decree refers to "owners of private houses [who] do not even carry out the most necessary renovation work on their property. Therefore, the condition of buildings, * * *, is speedily deteriorating." It is evident that petitioner was asked by his counsel to express an opinion about the Decree, such as a qualified expert might express. But, although Daniel is a lawyer, he was not shown to be qualified to express any expert opinion about the meaning and scope of the particular Decree. He was not in Hungary after 1948. By its provisions, the Decree does not declare the nationalization of unimproved city lots. We are unable to find that petitioner proved that his lot was nationalized under Decree No. 4. If the lot was nationalized in 1952 under some other edict of the Hungarian Government, the petitioner has not shown what it was. Although he relies primarily upon advice by a letter from Weiss, he did not produce the letter, *32 and did not give any satisfactory explanation for his failure to do so. Petitioner's proof about the alleged confiscation of his lot is not satisfactory, even allowing some latitude in the matter of proof under the circumstances. Cf. Wm. E. Reisner, supra. Petitioner has failed to prove that the lot was confiscated in 1952 by the Hungarian Government. With respect to the alleged loss of 300,000 pengos under the building contract, we are unable to find that 1952 is the year in which a loss in this amount was sustained. Even if it were to be concluded on the basis of the record before us that petitioner paid 300,000 pengos to Szilard in 1943 to construct a building, as he has testified, it is clear that factors other than the alleged nationalization of the lot brought to an end before 1952 all reasonable expectation that Szilard would render performance under the building contract, or would repay the money. There is no evidence that either petitioner or Szilard ever obtained a building permit or a permit to obtain building materials. A witness called by Sophie Daniel, Leslie E. Acsay, a Hungarian, an appraiser, and an architect, testified that he had built and sold houses in Budapest *33 during the period 1930-1947, and that he stopped building only during "the seige" from December 1944 into February 1945. Acsay testified that he had been able to obtain permits to purchase, and that he purchased, building materials in 1943, 1944, 1946, and 1947 for structures he built in Budapest, and that he obtained the materials in "the market." He testified further that he built an 11-story, concrete building, reinforced with steel, which was completed in 1947. Acsay was not called by Daniel. His testimony is harmful to Daniel's contention that it was not possible for Szilard to carry out his contract to construct a building under his contract. Daniel testified that Szilard was released from prison and left Hungary. He testified further that the contractor "was not in a position to build or repay my money," and this testimony refers to the year 1947. Assuming that the transaction with the contractor occurred under which Daniel paid him 300,000 pengos, the record here shows that the contractor either defaulted, or Daniel gave him several extensions of time to start construction up to 1947, and that in any event a loss of 300,000 pengos was sustained in 1948, at the latest. Daniel *34 would have been an "incorrigible optimist" to have believed that in 1948 or as late as 1952 there remained a reasonable expectation that either the building would be constructed or the money would be repaid. United States v. White Dental Mfg. Co., supra.It is concluded that a loss of 300,000 pengos was sustained prior to 1952. It is concluded further that if the lot was confiscated in 1952, as petitioner contends but has not proved, such confiscation of the lot was not the identifiable event which caused the loss of the money in question. We have considered Carter-Colton Cigar Co., 9 T.C. 219, and conclude that it does not apply here. The petitioner argues that while he was in Hungary, he was engaged in a business of owning real estate, and that the Nagy Street for was business property acquired for the purpose of constructing income producing property. This contention implies that he was in such business in 1943. Such arguments have been made in relation to Daniel's claim that a loss of either 66,000 pengos or of 366,000 pengos was a loss arising out of a trade or business, and that a net operating loss was sustained in 1952 for which he is entitled to *35 a net operating loss carryover to 1953 under sections 23(s) and 122. We need not consider these arguments in view of the conclusions already reached. However, if it were necessary to consider them it would not be concluded that Daniel was regularly engaged in a business of dealing in real estate or owning and operating property for the production of income in 1943, when he bought the lot, or during the years 1943-1952. In this connection, consideration has been given to all of the cases cited by petitioner, including Otis A. Kittle, 21 T.C. 79; and Walter G. Morley, 8 T.C. 904, which we conclude are not applicable. See also, Dunlap v. Oldham Lumber Co., 178 F.2d 781. Daniel testified that in 1935 or 1936 he purchased an apartment house, modernized it, and sold the property at some later time; and that in 1941 he purchased "city lots" and sold them about a year later. There is no other evidence about his activities relating to such properties. He did not state how long he owned, or when he sold the apartment building, or how many city lots he bought in 1941 and later sold. The questions whether a taxpayer is engaged in a business and whether *36 an asset is held as an investment or is used in a business regularly carried on, are questions of fact. See Eline Realty Company, 35 T.C. - (October 7, 1960), and cases cited; and W. T. Thrift, Sr., 15 T.C. 366. The management of one's investments does not constitute a trade or business, Commissioner v. Smith, 203 F. 2d 310, reversing 17 T.C. 135, certiorari denied 346 U.S. 816; Putnam v. Commissioner, 224 F. 2d 947, affd. 352 U.S. 82; Dalton v. Bowers, 287 U.S. 404, 409. Occasional transactions have been held not to constitute the carrying on of a trade or business. Burnet v. Clark, 287 U.S. 410; Nicholson v. Commissioner, 218 F. 2d 240; Ferguson v. Commissioner, 253 F. 2d 403; Appleby v. United States, 116 F. Supp. 410. The petitioner has not proved that when he bought the Nagy Street lot in 1943 he was engaged in a business of owning and operating or buying and selling real estate. With respect to the lot in question, the renting of the lot for one year was an isolated activity and was not sufficient to constitute a business of renting *37 the lot. Petitioner may have intended to use the lot in a business involving the contemplated apartment building but he never arrived at the operation of such business, and little was done even to prepare for such undertaking. The lot was idle and was not put to any use except for the casual renting of it to a gardener in 1944. Petitioner has not shown that the lot was held in the regular operation of a trade or business. We are unable to conclude that Daniel sustained a net operating loss in 1952 which he is entitled to carryover to 1953. Decision will be entered under Rule 50.