Lorenzo ALVARY, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 157, Docket 27107.

United States Court of Appeals Second Circuit.

Argued Dec. 14, 1961.

Decided May 18, 1962.

---

Nicholas R. Doman, New York City (Doman & Ablondi, New York City, on the brief), for plaintiff-appellant.

Robert Arum, Asst. U. S. Atty., Southern District of New York, New York City (Robert M. Morgenthau, U. S. Atty., and David Klingsberg, Asst. U. S. Atty., on the brief), for defendant-appellee.

Before LUMBARD, Chief Judge, and MOORE and HAYS, Circuit Judges.

LUMBARD, Chief Judge.

The plaintiff-taxpayer, Lorenzo Alvary, appeals from the dismissal of his suit for a refund of federal income taxes paid for the calendar years 1951 and 1955. He claims that he is entitled to a deduction in those years for a net operating loss carry-back to 1951 and carry-forward to 1955 from the tax year 1952 when, he alleges, two pieces of real property located in Budapest, Hungary, which he owned for rental purposes were nationalized by the Hungarian Communist government. Internal Revenue Code of 1939, §§ 23(s), 122, 26 U.S.C.A. §§ 23(s), 122.[1] The taxpayer received the properties as a gift in 1947 and 1948. In the District Court for the Southern District of New York, Judge Holland, sitting without a jury, denied the refund on the ground that the properties had no fair market vaue at the time of the gift and thus no tax basis to the taxpayer. We reverse and remand.

The taxpayer, a naturalized citizen of the United States, is an opera singer and a member of the Metropolitan and San Francisco Opera Companies. About March 1, 1947, his aunt, Mrs. Alfred Dietrich Ilona Beke, signed and executed a written document making a gift of her interests in two pieces of real estate located in Budapest, Hungary, to the taxpayer. She gave him a brick and stone house at Istenhegyi ut 84, called the Uptown Property, located in the fashion-

---

1. Section 23. "In computing net income there shall be allowed as deductions: * * * (s) * * * For any taxable year beginning after December 31, 1939, the net operating loss deduction computed under section 122."

Section 122(a). "As used in this section, the term 'net operating loss' means the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d)."

(d) (5). "Deductions otherwise allowed by law not attributable to the operation of a trade or business regularly carried on by the taxpayer shall * * * be allowed only to the extent of the amount of the gross income not derived from such trade or business. * * * This paragraph shall not apply with respect to deductions allowable for losses sustained after December 31, 1950, in respect of property, if the losses arise from fire, storm, shipwreck, or other casualty, or from theft."

able residential area on the right bank of the Danube. This building contained three apartments, of which two were rented and the third was occupied by the superintendent. She also gave the taxpayer her 50% interest in a three-story apartment house at Nagymezo utca 28, called the Downtown Property, located in downtown Budapest in the center of the city's theater and night club section. This building has six street-level stores and approximately 37 apartments, each with bathrooms and modern conveniences.

Mrs. Beke reserved for herself a "usufruct" in the Downtown Property, the right to receive its net income for her lifetime. She released the usufruct in mid-1948, and the gift of both properties was then recorded. Alvary, who resided in New York City, took possession by an agent who used the rental income for necessary repairs and for the payment of taxes.

On February 17, 1952 the Hungarian Communist government by formal Decree No. 4 nationalized a great deal of real property. Although no copy of the Decree was introduced in evidence, the testimony indicates that the Decree apparently covered all rental property and all houses owned by "former capitalists and enemies of the present regime." See Elek v. Commissioner, 30 T.C. 731, 732 (1958); Daniel v. Commissioner, 19 T.C. M. 1960–274 (1960), for translations of the 1952 nationalization decree. Under the Hungarian system of recording land titles, the history of each parcel of land appears on a separate page of the record book. The certified extract from the title pages for the Downtown Property shows that the title was taken by the Hungarian State under Decree No. 4 of 1952.

All the Uptown Property was also nationalized. It had recently been broken into two separate sections for recording purposes. One section of 800 square ols or fathoms shows the Hungarian State as owner under Decree No. 4. The extract from the other section, which is described as a house with court, garden, and forest, consisting of 833 square ols or fathoms, shows Lorenzo Alvary of New York as owner. Mr. Alvary testified that the whole Uptown Property had been expropriated. Furthermore, Decree No. 4 would apply to the Uptown Property for two separate reasons: it was used for rental and was owned by Mr. Alvary, a capitalist. It is possible that the extract from the land record did not reflect all the entries actually on the land record, or that the Hungarian Government failed to record their title. But the government's expert on Hungarian law testified that recordation is not a necessary prerequisite to the acquisition of title.

■ The taxpayer claimed a deduction on his federal income tax returns for the loss of these properties for which he received no compensation from the Hungarian Government. If property held for the production of income or in connection with a trade or business is confiscated without compensation, the owner is entitled to deduct the amount of his adjusted tax basis in the property. Internal Revenue Code of 1939, § 23(i). In determining the amount of a loss, a donee's unadjusted tax basis is the lower of the donor's basis or the fair market value at the time of the gift. Internal Revenue Code of 1939, § 113(a) (2). It is conceded here that the fair market value of these properties in 1947 and 1948 was less than the donor's basis. Therefore, in order to ascertain the deduction, if any, to which this taxpayer is entitled, it was necessary for the taxpayer to establish the fair market value of the Uptown and Downtown Properties in 1947 and 1948 when the gifts were made.

The taxpayer deducted the claimed loss from his 1952 federal income tax return, which deduction wiped out his 1952 taxes. The Commissioner did not dispute this deduction. Taxpayer sought to carry the unused portion of his loss back to 1951 and forward to 1953, 1954 and 1955, Internal Revenue Code of 1939, § 122, and the Commissioner denied the deductions. This suit is for a refund of

794

$1,196.90 on account of 1951 income taxes and $1,455.68 (including $89.69 interest paid) on account of 1955 inome taxes. Claims for 1953 and 1954 are pending in the Tax Court.

 Although there was expert testimony on both sides that the confiscated buildings had some market value at the time of the gifts to the taxpayer, and no evidence that the properties were valueless, Judge Holland, giving credence to materials in the New York Public Library not cited by the parties, held "that the infiltration of communist ideology had so taken hold of the economy in Budapest, Hungary, both in 1947 and 1948 that there was no market value of the two properties in question." It was error for the trial judge to take judicial notice of text books that were not a part of the record. Although it is proper, and all too frequently necessary, for a judge to do independent research on questions of law, the value of these two pieces of real property and the status of Hungarian free trade in 1947–48 are questions of fact. On fact questions the court should not use the doctrine of judicial notice to go outside the record unless the facts are matters of common knowledge or are capable of certain verification. See, e. g., Brown v. Piper, 91 U.S. 37, 42, 23 L.Ed. 200 (1875); McCormick on Evidence, chapter 37 (1954).

 Fair market value is defined by the regulations as "the price at which * * * property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell." Treasury Regs. 108, § 86.19(a); now Treas. Reg. § 25.-2512–1. During an abnormal period, such as depression, war, or political turmoil, when there are few or no willing buyers, fair market value is, at best, an elusive concept. But the small number of willing buyers does not preclude a finding that property has some fair market value. There is a difference between value and liquidity; that no buyers are presently accessible does not make the fair market value zero. See Groff v. Smith, 34 F. Supp. 319 (D.Conn.1940); First Seattle Dexter Horton National Bank v. Commissioner, 27 B.T.A. 1242, 1247 (1933), aff'd 77 F.2d 45 (9 Cir. 1935). In a time of emergency the value of property must be viewed in light of the existing situation. One can analogize the taxpayer's Hungarian building in 1947–48 to a structure which is located in the path of a fire. If no one knows of the danger, then the building will sell for a fair price. If people generally know of it, the price will decline as the blaze comes nearer and nearer because the chance that the building will escape damage decreases. There was expert testimony that the sweep of Communism in Hungary in 1947–48 had not yet materially reduced the value of real estate. Judge Holland disregarded this testimony and decided that by 1947–48 free trading had ended and there was no fair market value. A trial judge cannot arbitrarily disregard all the expert testimony in the record and rely upon his unsubstantiated personal beliefs instead of upon evidence. Cullers v. Commissioner, 237 F.2d 611 (8 Cir. 1956); Nachod & United States Signal Co. v. Helvering, 74 F.2d 164 (6 Cir. 1934); Pittsburgh Hotels Co. v. Commissioner, 43 F.2d 345 (3 Cir. 1930). The finding that the two parcels of real property here in question had no fair market value in 1947 and 1948 was clearly erroneous.

All the experts testified that subsequent to 1938 the Hungarian real estate market was in a state of constant flux, first because of the war and then because of the threat of Communist takeover. Therefore, they valued the property as of 1938 and then estimated the change in value from 1938 to 1947–48. In Lajtha v. Commissioner, 20 T.C.M. 1961–273 (1961), the Tax Court used 1938 values in valuing Hungarian realty in 1944 at the height of the Second World War. See also Daniel v. Commissioner, 19 T.C.M. 1960–274 (1960). Leslie E. Acsay, the taxpayer's expert, testified that although the volume of the real estate market after World War II was very small, the prices were firm for the good properties and it was a fair market. He further testi-

fied that in 1947 there was no political turmoil. He valued the Downtown Property at $120,000 during 1947 and the Uptown Property at $18,000 to $20,000 during 1947 and 1948.

The government's expert, Laszlo Miskolczy, agreed with Mr. Acsay that they were indeed valuable properties. Except for estimating that the Downtown Property was worth slightly less, Mr. Miskolczy also agreed with Mr. Acsay's valuations of the properties as of 1938. Although he did not make any attempt to value the two properties in 1947–48, he testified that in 1947 there was a good market in smaller properties like the Uptown Property and that he was not an expert in large properties like the Downtown Property. But Mr. Miskolczy then testified that because of the political situation, "in many cases" the 1946–48 selling price was not a true representation of the 1938 values, and that "only in exceptional cases, if an honest buyer would pay the honest price" could a seller get the 1938 value in 1947–48. He explained that the richer people who wanted to leave Hungary would sell their property to get some money for the trip "and sometimes they would not get the real value of the property." However, he explained that the expropriation of all industrial plants with more than 100 employees in March 1948 "was the first sign that here the Communists decided to take over the country." After that, he testified, people became "a little bit" fearful of buying and selling property, and this fear increased as 1952 approached. At the time of this initial expropriation the taxpayer had already received the gift of both properties and shortly after the expropriation his aunt's usufruct was released. Therefore, the fear generated by nationalization of the large industries could have had little effect on the value of the properties at the time of their receipt by the taxpayer.

The taxpayer's second expert, George S. Pinter, testified that the Hungarian real estate market did not begin to deteriorate until August 1948, although there had been fewer buyers between 1946 and 1948 than during the late 1930's. He estimated the value of the Downtown Property in 1947 at $130,000.

David Tobler, an international economist and analyst for the Chase Manhattan Bank, who testified for the government placed the Communist takeover of Hungary in May of 1947. Mr. Tobler's testimony must be viewed in light of the fact that he has been in the United States since 1921 and has not made a survey of economic conditions in Hungary since 1925. Moreover, he admitted that the United States had economic, political and diplomatic relations with Hungary during 1947 and 1948.

From all this expert testimony it is clear that in 1947–48 real estate values in Hungary had not yet begun to tumble in anticipation of Communist expropriation. Although in the Tax Court a taxpayer need only prove that a deficiency is erroneous, in a suit for a refund in the district court he must prove the amount of the error by showing what the value was. See, e. g., Burnet v. Houston, 283 U.S. 223, 51 S.Ct. 413, 75 L.Ed. 991 (1931); United States v. Anderson, 269 U.S. 422, 443, 46 S.Ct. 131, 70 L.Ed. 347 (1926); Taylor v. Commissioner, 70 F.2d 619, 620–621 (2 Cir. 1934), aff'd sub nom. Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1926); 10 Mertens, Federal Income Taxation § 58A.35. However, since fair market value is not susceptible to exact proof, "it is not necessary that the value arrived at by the trial court be a figure as to which there is specific testimony, if it is within the range of figures that may properly be deduced from the evidence." Anderson v. Commissioner, 250 F.2d 242, 249 (5 Cir. 1957), cert. denied, 356 U.S. 950, 78 S.Ct. 915, 2 L.Ed.2d 844 (1958). Taxpayer's expert testimony on the properties' fair market value is as precise as one can expect in light of the inherent inexactness of the concept of fair market value and the remoteness of both the location of the property and the relevant date. In response, the government, conceding that the properties had some value, challenged the accuracy of the taxpayer's es-

timates, but did not offer any estimates of its own. Even were the court to accept the government's position that the value of the properties had declined, there is no evidence in the record on which to reach a specific lesser figure. If the government fails to offer its estimate of value in a situation in which it is able to do so and no other substantial evidence on which to base a lower valuation exists, the court may accept the taxpayer's figures.

The taxpayer in his brief offers to accept the lowest values testified to by the experts rather than submitting to the expense and vexation of another battle of experts. See Galt v. Commissioner, 216 F.2d 41, 51 (7 Cir. 1954), cert. denied, 348 U.S. 951, 75 S.Ct. 438, 99 L.Ed. 743 (1955); Kweskin v. Finkelstein, 223 F.2d 677, 679 (7 Cir. 1955). This court has the power under 28 U.S.C. § 2106 to affirm, modify, vacate, set aside, or reverse the judgment. See Kweskin v. Finkelstein, supra; Galt v. Commissioner, supra. Having rejected as clearly incredible in light of all the testimony the few suggestions that property in Hungary had no market value in 1947–48, we accept the lowest valuation testified to at the trial. Mr. Miskolczy, the government's witness, gave the lowest valuation of the Downtown Property, $106,500.[2] The taxpayer's one-half interest amounts to $53,250. The lowest valuation of the Uptown Property, $18,000, was offered by the taxpayer's expert, Mr. Acsay.

A necessary prerequisite to carrying this loss back to 1951 and forward to 1955 is that it be "attributable to the operation of a trade or business regularly carried on by the taxpayer." Internal Revenue Code of 1939, § 122(d) (5).[3] For several years prior to World War II, the taxpayer himself managed the Downtown Property for his aunt and her co-owner. When his aunt gave him her interests in the Downtown and Uptown Properties, Mr. Alvary took possession of them by his agent in Budapest, who thereafter collected the rents and used the income to pay taxes and make repairs, until the two properties were nationalized. In addition to these rental activities in Hungary, the taxpayer was a member of a partnership that owned for rental purposes three pieces of real property located in the United States.

The rental of real estate is a trade or business if the taxpayer-lessor engages in regular and continuous activity in relation to the property, Pinchot v. Commissioner, 113 F.2d 718, 719 (2 Cir. 1940); Gilford v. Commissioner, 201 F. 2d 735, 736 (2 Cir. 1953); Grier v. United States, 120 F.Supp. 395 (D.Conn. 1954), aff'd per curiam, 218 F.2d 603 (2 Cir. 1955), even if the taxpayer rents only a single piece of real estate. Lagreide v. Commissioner, 23 T.C. 508, 512 (1954); Reiner v. United States, 222 F. 2d 770 (7 Cir. 1955); Elek v. Commissioner, 30 T.C. 731 (1958); Schwarcz v. Commissioner, 24 T.C. 733, 739 (1955). Of course the owner may carry on these activities through an agent as well as personally. Pinchot v. Commissioner, supra; Gilford v. Commissioner, supra; Elek v. Commissioner, supra; Schwarcz v. Commissioner, supra, at 739; Lajtha v. Commissioner, 20 T.C.M. 1961–273 (1961); 5 Mertens, Federal Income Taxation, 1961 Cum.Supp. § 29.06, at 112–13. If the taxpayer, personally or through his agent, continuously operates the rental property without deviation from the planned use, the trade or business is sufficiently regular to satisfy the § 122(d)

---

2. Although this estimate was as of 1938, the government has not shown the extent of the decline in real estate values, if any, between then and the date of the gifts to the taxpayer.

3. Or that the loss arose from "fire, storm, shipwreck, or other casualty, or from theft." Internal Revenue Code of 1939, § 122(d) (5). However, the taxpayer does not contend that confiscation falls within the phrase "other casualty," and, indeed, previous decisions apparently preclude such a contention. See I.T. 4086, 1952–1 Cum.Bull. 29; Mayer v. United States, 115 F.Supp. 171, 174, 126 Ct.Cl. 1 (1953); Gurry v. Commissioner, 27 B.T.A. 1237 (1933); Formel v. Commissioner, 9 C.C.H.T.C.M. 782 (1950).

(5) requirement that it be "regularly carried on by the taxpayer." Lagreide v. Commissioner, supra, 23 T.C. at 512; Elek v. Commissioner, supra; Schwarcz v. Commissioner, supra, 24 T.C. at 739–740; Daniel v. Commissioner, 19 T.C.M. 1960–274 (1960). The taxpayer's rental activities in this case clearly satisfy these requirements.[4]

Reversed and remanded with directions to deduct depreciation allocable to the period between taxpayer's acquisition of the property and its confiscation and to compute the amount of the refund in accordance with this opinion.

HAYS, Circuit Judge (concurring in the result).

I concur in the result on the ground that the lower court was required under the circumstances to accept the evidence submitted by the taxpayer.

---

4. Elek v. Commissioner, 30 T.C. 731 (1958); Daniel v. Commissioner, 19 T.C.M. 1960–274 (1960); Lajtha v. Commissioner, 20 T.C.M. 1961–273 (1961), are other cases in which a net operating loss carryover has been allowed for the 1952 Hungarian nationalization of rental property.