Abel Louis Lajtha and Marie Hanson Lajtha v. Commissioner.
Lajtha v. Commissioner
Docket Nos. 70188, 70190.
United States Tax Court
T.C. Memo 1961-273; 1961 Tax Ct. Memo LEXIS 74; 20 T.C.M. (CCH) 1426; T.C.M. (RIA) 61273; September 29, 1961
*74 Gabriel T. Pap, Esq., for the petitioners. Gerald J. Robinson, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The respondent determined a deficiency of $1,334.19 for the year 1952 in the case of Abel Louis Lajtha, and deficiencies of $170.90 and $1,381.08 for 1953 and 1954, respectively, in the case of both petitioners. The sole contested issue concerns a loss claimed for 1952 giving rise to a net operating loss carry-over for the following years. The petitioners claim an overpayment of $652.40 for 1953. The returns of the petitioners were filed with the director of internal revenue for the Upper Manhattan District, New York. Findings of Fact Abel Louis Lajtha was born in Hungary and resided there until September 1947. He came to the United States in December 1948 and has not since returned to Hungary. Marie Hanson Lajtha was born in Minnesota. The petitioners were married in 1953. They resided in New York, New York, in the taxable years. In such years Abel was employed by the New York State Psychiatric Institute as a research associate. Abel's grandmother died on December 17, 1944, at Budapest. At the time of *75 her death she owned a one-half interest in two parcels of improved real estate in Budapest which may be identified as 79 A Voci Street and 10 Kiraly Street. The inventory of this property was made and rights of the heirs were examined before a public notary of Budapest in December 1947. By previous arrangement, Abel's father renounced his one-half share, his two sons succeeded to his interest, and an agreement was concluded under which Abel received five-twelfths of the decedent's share in the Kiraly property as his share of the total estate. The public notary determined that the estate should be transferred according to the agreement and notice given to all parties, the Tax Assessing Office, and the Central District Court as Land Registry Office. The Court entered an order accordingly in September 1948. Abel owned a five twenty-fourths interest in the Kiraly property. The property at 10 Kiraly Street was an old building, occupying an area of 22,000 square feet, with a frontage of approximately 96 feet. The front was of four stories and the rear was two or three stories high. It contained shops facing the street and facing a courtyard. Originally there were some 50 apartments. During *76 the war there was some damage from bombs and thereafter about 30 rental units remained which were used by tenants. Abel did not live on the property nor did any relative of his. The property was managed by an agent for the owners. In the years after 1944 and prior to 1952 the rents collected could not be transferred out of the country, but the agent used such proceeds for maintenance of the property and payment of taxes. Abel received no remittances of his share of the income after coming to the United States. In 1944 the United States dollar was exchangeable for 4.29 Swiss francs. The Hungarian pengo was considered as exchangeable for Swiss francs at the rate of 104.25 pengos to 100 francs from 1942 until October 1944. No actual rate of exchange of pengos for Swiss francs is available thereafter. The pengo became inflated in 1945 and was replaced by a new unit of currency in 1947. The Hungarian Government, on February 17, 1952, by Decree No. 4 of 1952, nationalized certain privately owned buildings, including apartment houses. In March 1952 the Budapest Central District Court issued a writ directing the Land Registry Office to enter the ownership right as to the 10 Kiraly property, *77 previously registered as owned by Abel Lajtha and others, in favor of the State pursuant to the foregoing Decree. Abel received no compensation or offer of compensation for this property. In his United States income tax return for 1952, filed in March 1953, Abel claimed a loss on account of confiscation and nationalization of property by the Hungarian Government of an apartment house at 10 Kiraly Street, Budapest, reporting a loss of five-twelfths interest in property valued at $15,793.30, amounting to $6,580.55. Abel filed an amended return for 1952 in February 1957, in which he computed the basis of the confiscated property as $157,734.48, alleged that his interest was five twenty-fourths and claimed a loss of $32,861.35 as a business loss, with a carry-back to 1951 and carry-over to 1953. The petitioners filed a timely joint return for 1953 in which a loss carry-over from 1952 in the amount of $670.48 was claimed. They filed an amended return for 1953 in February 1957 claiming a loss carry-over to 1953 of $22,704.78. They filed a joint return for 1954 in which a loss carry-over of $18,416.09 was claimed. In December 1954 Abel filed a claim for refund of income tax for 1951 in *78 the amount of $758 based upon the loss of property by nationalization. Abel's basis of his interest in February 1952 was $17,700. He sustained a net operating loss of that amount in 1952. Opinion The petitioners contend that Abel Lajtha sustained a net operating loss in 1952 and is entitled to a loss carry-back to 1951, and that both petitioners are entitled to a loss carry-over to 1953 and 1954. They allege that he owned an interest in income-producing property in Budapest, acquired by inheritance in 1944, and managed by an agent; that the property was nationalized by the Hungarian Government in February 1952 without compensation; and that the value of the property is established by evidence. The respondent contends that the petitioners have not met the burden of proof of the loss claimed and have not proved that Lajtha owned any interest in such property, or the extent of the interest claimed, or the amount of his basis in that property in United States dollars. In Peter S. Elek, 30 T.C. 731 (1958), acq. C.B. 1958-2, 5, we held that a taxpayer sustained a net operating loss when the Hungarian Government nationalized business property in Budapest which he owned. *79 The nationalization was by a Decree, Number 4 of 1952, of the Hungarian Government, dated February 17, 1952. The same decree is the basis of the claim of nationalization in the present case. The respondent, although acquiescing in the Elek case, is disturbed by the number of similar claims presented by United States citizens who were formerly owners of property in Hungary which was nationalized or confiscated by the present government of Hungary. The respondent is apprehensive of possible claims which may arise from confiscation of American-owned property in Cuba and therefore urges that claims of this nature should not be allowed unless clearly proved by competent evidence, lest fraudulent claims diminish the revenue. The petitioners answer that where a taxpayer has sustained an actual loss of this nature the statute permits a deduction. The respondent makes no suggestion of fraud on the part of these petitioners. The petitioners offered in evidence Exhibits 9, 11, and 12, to which the respondent objected. The objections have been disposed of by an Order entered herein and the exhibits are in evidence. We think the record, taking the documentary exhibits in conjunction with *80 the oral testimony, adequately establishes that Lajtha and the other co-owners managed the property through an agent who collected rents, maintained the property, paid taxes and turned over net shares to the co-owners in Hungary. The currency was blocked and not transferable outside the state. Lajtha received no net proceeds personally after coming to the United States. Lajtha, as a co-owner of rental property managed by an agent in a foreign country, was carrying on a business and when this property was lost by nationalization without compensation he sustained a net operating loss. Peter S. Elek, supra; Adolph Schwarcz, 24 T.C. 733 (1955), acq. C.B. 1956-1, 5. The respondent next contends that the petitioners have failed to prove their basis in the property. The amount of any deductible loss is limited to the taxpayer's adjusted basis. Property acquired by inheritance has a basis equal to its fair market value at the date of acquisition and that basis must be adjusted for depreciation. The valuations given by appraisers were made in 1956 or later and related to the condition of the property as of 1938 or 1939 rather than as of December 1944, when the *81 property was inherited. And even if a valuation in pengos is determined there is no rate of conversion of such currency into United States dollars at that date. The respondent argues that the fair market value in dollars has not been shown as of 1944 or as of 1952. A considerable difficulty arises in ascertaining the amount of the loss. A witness who had been a qualified architect in Budapest, had appraised properties there for the Hungarian Ministry of Finance during the war and was acquainted with this and nearby properties, testified for the petitioners as to the value of the land and building in the years 1939 to 1941. A witness who was a qualified real estate appraiser and architect, was familiar with real estate market conditions in Budapest from 1938 to 1946 and familiar with this property, and who is now a licensed architect in New York City testified for the respondent as to the values of this land and building in 1938 and 1939. These valuations are not far apart and we find the lesser acceptable. The building would have some further depreciation in value by December 1944 and proper adjustments should be made for depreciation for the period following until February 1952. *82 There was some bomb damage to the building, and apparently this occurred after Lajtha inherited his interest. As a result of this damage there were fewer units available for rental. A substantial reduction in the valuation is in order on account of such damage. A considerable part of the valuation was allocated to the land by the appraisers. The lower valuation given by the appraisers estimated the building at 105,000 and the land at 350,000 pengos. The testimony indicates that the land was in a location desirable for commercial use, but the building was old. We believe it would not be error to consider the building as fully depreciated by 1952 through age and bomb damage, and compute the loss from the value of the land alone. In 1944 Hungarian pengos were not exchangeable directly for United States dollars, but both currencies were measurable in Swiss francs. Because of the advance of the Russian army upon Budapest, there was no exchange rate of pengos for francs after October 1944, and in the following years the pengo became valueless through inflation. For the limited purpose of measuring the value of the interest in the land inherited by Lajtha in December 1944, we accept the *83 nearest approximation of the pengo available, that of 104.25 pengos to 100 Swiss francs, a figure which was constant from late in 1941 to October 1944. This was prior to the inflation which destroyed the value of the currency. So measured we find the value of the five twenty-fourths interest in the land inherited by Lajtha to be $17,700 in 1952 and this is the amount of his loss. The petitioners offered no evidence or argument concerning other issues raised in the petitions and therefore we consider them abandoned. Decisions will be entered under Rule 50.