Erno Laszlo and Irene Laszlo v. Commissioner.
Laszlo v. Commissioner
Docket No. 72819.
United States Tax Court
T.C. Memo 1962-111; 1962 Tax Ct. Memo LEXIS 198; 21 T.C.M. (CCH) 605; T.C.M. (RIA) 62111; May 4, 1962
*198 Robert Ash, Esq., and Carl F. Bauersfeld, Esq., for the petitioners. William F. Chapman, Esq., for the respondent. RAUM
Memorandum Opinion RAUM, Judge: The Commissioner determined deficiencies in income tax against petitioners, husband and wife, as follows: Year
Deficiency
1953
$18,555.80
1954
14,194.98
1955
9,617.89 Petitioners reside at 14 East 78th Street, New York, New York, and filed their joint returns for the years in controversy with the director of internal revenue, third district, New York, New York. The husband will sometimes hereinafter be referred to as petitioner. The principal issue is whether petitioner sustained a loss in 1952 upon the confiscation by the Hungarian Government of two commercial properties in Budapest, Hungary; if such loss were sustained, it is not contested that it may be used in computing a net operating loss deduction which may be carried forward under the statute to the years before us. We heard testimony and received certain exhibits in evidence with respect to this issue, and we are satisfied that if petitioner owned the property in question in 1952, he did sustain a deductible loss at that time. Peter S. Elek, 30 T.C. 731, *199 acq. 1958-2 C.B. 5. However, the state of the record is such that we cannot find that petitioner owned the real estate in question at the time of the 1952 Hungarian confiscation decree. The evidence shows that petitioner, a native of Hungary, practiced medicine in Budapest from 1926 to 1938 when he and his wife came to the United States. They have resided in this country since 1938. When they left Hungary they took with them only a comparatively insignificant amount of money. Petitioner testified that in 1938, some months prior to his leaving Hungary, he purchased two business properties from his sister-in-law, Mrs. Andrew Miklos, and that he paid 1,550,000 pengos therefor. He stated that the purchase price was paid "part in pengo, then in pounds, in francs, in gold coins, in jewelry and in diamonds". The sister-in-law was the widow of a prominent Hungarian publisher of three daily newspapers which were vigorous opponents of totalitarian government. She succeeded her former husband as publisher of these newspapers, which continued to maintain the same political editorial policy. The two business properties allegedly purchased from her by petitioner were unrelated to *200 the publishing enterprise. The alleged deeds to these properties were not recorded, but petitioner testified that a written contract was executed between the parties reflecting the purchase; however, this contract was kept secret for fear of reprisals. Although the buildings were rented, petitioner never received any rent therefrom either directly or indirectly. The sister-in-law continued to receive the rents until some point near the early part of World War II, when all her properties (including presumably the two buildings in her name which had allegedly been sold to petitioner) were taken away from her by the Nazis. In response to questions by the Court petitioner testified as follows: THE COURT: Were these properties taken from your sister-in-law during the nazi occupation? THE WITNESS: Yes. THE COURT: When? THE WITNESS: These I wouldn't know. I went away 1938 and the German came in, I think, in 1940. But they took over before they came in physically everything. THE COURT: Now, were these two buildings ever restored to her? THE WITNESS: No. THE COURT: They never were? THE WITNESS: Never. THE COURT: But they were taken away from her either during the World War *201 2 or shortly before? THE WITNESS: Before. THE COURT: And never restored to her thereafter? THE WITNESS: Never. THE COURT: After the end of World War 2 in 1945, and between 1945 and 1952, did either you or your sister-in-law make any efforts to reacquire these two properties?$ tTHE WITNESS: Couldn't be, your Honor. As I have told you, she was politically so, so delicate position that she was - she was happy that they let her - that they didn't put her in the jail, because after the nazis, immediately started the communist system. That was no liberty, not for two minutes, because again, the German and the nazis, the Russian came in and they liberated Hungary, and as soon as the Russian came in then the nazis were put in the jail and came on top the communists. That since the war started, including today, too, there is no liberty there. THE COURT: Neither you nor your sister-in-law got any rents from these properties during the years from 1945 to 1952? THE WITNESS: No. I don't - she got in the first year, in the first two years, but from the war on she didn't get. THE COURT: By "the first year," you mean 1938 and 1939? THE WITNESS: 1939, yes. THE COURT: But neither *202 you nor she got any rent after 1940? THE WITNESS: I think that she got until the war, until she got rent, because when we left then I ask her what rent she got and that she should keep it for the house to renovation and what she needs to spend money. THE COURT: But no rents were paid either to you or your sister-in-law after 1940? THE WITNESS: To me not. THE COURT: You received none? THE WITNESS: None. THE COURT: Did you take any steps after the end of the war to establish your right in these properties? THE WITNESS: Your Honor, after ending the war, that was the same critical situation as was before the war, only the color changed. Before it was the nazis; later it was the communists. So that the same - without risking her life, I couldn't do anything. That was so little money that wasn't - we didn't even write to each other how we are and how she is. And it always was in the background, how she is. Even the unknown Hungarian people that was - that was the problem, but not for her. To be sure, there is other testimony that in some respects is inconsistent with the foregoing. But the record is in such confusion that even if we should conclude that petitioner had purchased *203 the properties in 1938, we cannot find that he continued to own them up to the date of the 1952 Hungarian confiscation decree. There is evidence that after the conclusion of the War in 1945 a Free Government of Hungary was established, but that it was replaced in 1947 by a communistic regime. However, petitioner took no steps during this period to assert his alleged rights with respect to the properties. The record strongly suggests that any interest that petitioner may have had in the properties was wiped out long before 1952. Certainly we cannot find on this confused record that he owned the properties in question in 1952. In the circumstances this issue must be decided against him. The correctness of an adjustment by the Commissioner in relation to medical expenses depends upon our decision with respect to the principal issue above. Several other adjustments have not been contested. Accordingly, Decision will be entered for the respondent.