Eugene De Thassy v. Commissioner.
De Thassy v. Commissioner
Docket No. 72858.
United States Tax Court
T.C. Memo 1963-180; 1963 Tax Ct. Memo LEXIS 166; 22 T.C.M. (CCH) 859; T.C.M. (RIA) 63180; June 27, 1963
Gabriel T. Pap, for the petitioner. Ronald S. Schacht, for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in petitioner's income taxes for the calendar years 1953, 1954, and 1955 in the amounts of $899.02, $717.10, and $719.46, respectively. Petitioner has conceded that deductions were properly disallowed in the statutory notice for city sales tax, medical expense, interest expense, and charitable contributions. Respondent has conceded that petitioner is entitled to an additional deduction of $2.36 in 1953 resulting from an understatement of his deduction for New York State income taxes. The remaining issues are: (1) whether petitioner sustained a net operating loss in 1952 which may be carried forward to each of the years in issue and (2) *167 whether petitioner incurred deductible business expenses in each of the years in excess of those allowed by respondent. Findings of Fact Some of the facts are stipulated and are found accordingly. Petitioner is an individual presently residing at 1065 Madison Avenue, New York, New York. He filed timely Federal income tax returns for the calendar years 1953 through 1955 with the district director of internal revenue, Upper Manhattan district, New York. A timely "Consent Fixing Period of Limitations Upon Assessment of Income and Profits Tax" with respect to the taxable year 1953 was filed by petitioner extending the period of limitations to June 30, 1958. A timely statutory notice of deficiency with respect to the years 1953 through 1955 was mailed to petitioner on February 4, 1958. Petitioner left Hungary on November 29, 1946 and arrived in the United States on December 6, 1950. He is a citizen of the United States. Petitioner's father and his brother, a minor, were killed during a Yugoslay invasion of Hungary. Petitioner's father died in the morning of November 10, 1919 and his brother later the same day. Petitioner was born a few months subsequent to that date. Petitioner's *168 father died intestate. Under the laws of Hungary, the father's entire estate passed to petitioner and his brother in equal shares per stirpes, subject to "widow's right," or "usufruct," as it is known in civil law, in petitioner's mother. Under Hungarian law, petitioner inherited his brother's share when his brother died a few hours subsequent to his father. Petitioner's mother was still alive at all times here material and has not remarried since the death of her husband. The widow's right under Hungarian law consists in substance of the right to take possession of the assets belonging to the estate of the deceased spouse and to collect the income therefrom. Title to the assets passes to the issue of an intestate and the issue thereby acquire full powers to sell or mortgage such assets and to dispose of such assets in any manner not inconsistent with the widow's right. The widow's right terminates upon the death or remarriage of the surviving spouse and may be restricted by judicial decision or agreement upon the demand of the distributees, to a portion of the assets of the estate, provided that income from such portion of the assets will be sufficient for the proper maintenance *169 of the surviving spouse. Under Hungarian law a spouse entitled to the widow's right is not impeachable for normal waste or normal depreciation. She is impeachable for intentional waste inflicted upon the assets of the estate. Under Hungarian law the owner of the property subject to the widow's right has no right to any rental income received from such property, nor is such person responsible for the expenses of upkeep and repairs to such property. Any rental income and the responsibility for upkeep and repairs belong to the widow. Property located in the community of Dravatamasi, in the county of Somogy, in the southwestern portion of Hungary, was owned by petitioner's father at his death. The property consists of two houses and gardens. Farm land and farm buildings originally connected with the property were taken without compensation by the government under the Land Reform Act in 1945 and constituted no part of the property thereafter. The manor, or "big" house, is a one-story brick building with tile roof and consists of about 10 rooms, kitchen, 2 bathrooms, corridors, cellar, attic, and storerooms. The so-called "guest" house is about half as large as the big house and *170 is divided into two apartments. It is also a one-story brick building with tile roof, consisting of 7 or 8 rooms, 2 kitchens, 2 bathrooms, corridors, storerooms, attic, and cellar. The big house is about 150 to 200 years old and has been rebuilt and added to through the years. The guest house was built in 1916. The guest house was first rented in 1938 and was rented continuously thereafter. The big house was rented beginning in 1945 and was occupied by a number of frontier guards and their families. The property in question was confiscated without compensation by the Communist government of Hungary on February 17, 1952. Petitioner performed some work in regard to the management of the rental property. After achieving his majority, petitioner signed all legal documents as agent for his family. Petitioner occasionally received some of the money which was paid as rent for the houses. The rates of exchange applicable to some of the years involved are as follows: 1919
100 Hungarian kronen equalled 75 cents
in United States money
1938
5 Hungarian pengos equalled one dollar
in United States money
The average exchange rate between Hungarian pengos and Swiss *171 francs from January 1944 to October 1944 was 100 pengos to 104.25 francs. The average exchange rate between United States dollars and Swiss francs during 1944 and 1945 was one dollar to 4.29 francs. One hundred pengos thus equalled $24.30 during the period from January 1944 to October 1944. The Hungarian pengo became highly inflated in 1945. In August 1946 the forint became the monetary unit in Hungary, at which time the pengo became obsolete. The value of the big house in 1938 was 100,000 pengos, or $20,000. The value of the guest house in 1938, was 49,000 pengos, or $9,800. The depreciated value in dollars of the two houses subsequent to 1938, calculated at two percent annual depreciation, is as follows: Year
Value
Big house
1945
$17,200
1952
14,400
Guest house
1952
7,056
The value of the land in pengos at their 1938 value was 9,000 pengos or $1,800. The fair market value of the property at the time of its inheritance by petitioner was similar to or higher than its value in 1938. The last stable pre-war year for property values in Hungary was 1938. Due to the retreat of the Germans and the confusion and shortage of money resulting therefrom, *172 there was no market for property of the sort involved here at the beginning of 1945. The Communists took over the government of Hungary subsequent to 1945. The parties have stipulated that, due to the widow's right, petitioner's loss, if any, cannot exceed 63.6 percent of the total adjusted basis of the property at the time the loss, if any, was allegedly suffered. No legal action has ever been instituted, nor any agreement entered into, to restrict the petitioner's mother to a portion of the assets belonging to petitioner's father's estate. Under Hungarian law, petitioner was not entitled to any income nor responsible for any expenses in connection with the property in issue. The activities engaged in by petitioner with respect to the property were done to aid his mother and were not the operation of his own business. Nonreimbursed business expenses were claimed by petitioner on his tax returns for 1953, 1954, and 1955 and were partly disallowed by respondent as follows: 1953
"Columbia University [English composition]
$ 10.00
Business trips to Pennsylvania, Washington D.C.,
Vermont, Boston: auto expenses
280.00
hotel expenses
128.00
meals while traveling
96.00
telephone
22.00
tips
15.00
Subscriptions, magazines, books
45.00
Expenses to write the themes for my job
74.00
Entertainment of business connections
88.00
Received people as a host at home
46.00
Total
$ 804.00"
Amount disallowed - $551
1954
"Business trips (including auto expenses, hotels, meals,
telephone, and tips)
"to Buffalo, Niagara Falls, Hamilton Ont., Toronto
Ont., Montreal Que.
$ 95.00
further to Washington D.C.
40.00
further to Cape Cod, Mass.
50.00
further to Tanglewood, Mass.
30.00
Big trip to Chicago, Milwaukee, Hamilton Mont.,
Yellowstone Park, ManhattanMont.
320.00
Several smaller trips
80.00
further to Vermont
65.00
Subscriptions, books, magazines, news
175.00
Expenses to write the themes for my job
62.00
Entertainment of business connections
124.00
Received people as a host at my home
52.00
Total
$1,093.00"
Amount disallowed - $850
1955
"Business trips (including auto expenses, hotels, meals,
telephone, and tips)
"4 times to Montauk Point, L. I.
$ 58.00
further to Washington D.C.
35.00
further to Boston, Mass.
62.00
twice to Vermont
185.00
Subscriptions, books, magazines, news
188.00
Expenses to write the themes for my job
96.00
Entertainment of business connections
176.00
Received people as a host at my home
84.00
Fee for editing
40.00
Total
$ 924.00"
Amount disallowed - $674
*173 Petitioner is a writer by occupation. He was employed by the Free Europe Committee, Inc., of New York during the years in issue. A short story with a European theme written by petitioner was included in a collection of stories published in 1953. Petitioner's trips were generally of a sightseeing nature. He gathered impressions and information which would be useful to him as a writer. The ordinary and necessary business expenses incurred by petitioner in each of the years in issue did not exceed the amounts allowed by respondent. Opinion The primary question, which relates to the law of Hungary as it applies to the property claimed to have been seized, has been disposed of in our findings. While the record is less than crystal clear, it seems to us to leave no doubt that under applicable Hungarian law and on the undisputed facts petitioner, although the owner of what is comparable to a fee simple interest, had no right to rent the property nor to receive any of its income. His mother, the surviving widow of petitioner's father, to whom petitioner succeeded by intestacy, was entitled to what the witnesses described as a "usufruct," or widow's right, which, in the absence of *174 enforceable restriction of its scope, encompassed the entire current income from the property. [1] It is stipulated that "no action has ever been instituted to restrict the petitioner's mother to a portion of the assets belonging to the estate." The result is that while petitioner may have lost the property in 1952, a year not before us, he cannot be said to have been engaged in the trade or business of renting the property, cf. Leland Hazard, 7 T.C. 372 (1946), so that his loss in the year of seizure can be carried forward to other years under the provisions of section 122, I.R.C. 1939. Gus Corey, 29 T.C. 360, 364 (1957). *175 There is some suggestion that in any event petitioner inherited one half of the property from his brother, who survived by a few hours, rather than from his father. Even were that true, there is no proof that petitioner could inherit from his brother any greater estate than he himself acquired. Both shares would prsumably be subjected to the charge of the widow's usufruct as long as the widow lived; and, though petitioner may have succeeded to both when his brother died, we cannot see that that increased his present interest in the property. Since this conclusion disposes of the proceeding, it becomes unnecessary to consider other contentions advanced by respondent, such as the failure to show fair market value at the time of any conversion by petitioner to business use, Heiner v. Tindle, 276 U.S. 582 (1928); the inadequacy of evidence as to petitioner's basis; and that the seizure itself is purely problematical on this record. But cf. Peter S. Elek, 30 T.C. 731 (1958); Alvary v. United States, 302 F. 2d 790 (C.A. 2, 1962). The second issue involves amounts claimed as business expenses which were partly disallowed by respondent. The whole *176 of petitioner's evidence consisted of a recitation of the schedules as they appeared on his tax returns and the statement that travel is necessary for a writer to gather impressions, experiences, and knowledge. Even assuming that such travel can be an ordinary and necessary expense for petitioner and hence deductible, there is no proof regarding the expenses actually incurred nor their proximate relationship to his work. Petitioner's mere assertion that the amounts claimed on his return were proper is insufficient to sustain his burden of proof. Louis Halle, 7 T.C. 245 (1946), affd. 175 F. 2d 500 (C.A. 2, 1949), certiorari denied 338 U.S. 949. There is likewise no proof regarding the other expenses claimed. Nor is this a Cohan [2] situation where no amount whatever was allowed. Respondent has not disallowed all of petitioner's deductions and we cannot find from this record that the amounts allowed were inadequate. With the evidence in this posture, there is no alternative to sustaining respondent's determination. Decision will *177 be entered under Rule 50. Footnotes
1. Respondent's witness on Hungarian law testified: Q. If this property were rented in 1945 and if no action had ever been instituted to restrict the widow's rights, and if the widow were still alive and had not remarried, who would be entitled to the rental income from such property? A. Only the widow. * * *
Q. Therefore, if no action had ever been instituted to restrict the widow's right and if the widow was still alive and had not remarried, are there any exceptions to the intestate law which had been presented in this case which could have been operated to cause the son to be entitled to any of the rental income? A. No. Q. Or obligated him to bear expenses for the normal upkeep of the property? A. No. Q. Who would have the legal right and the obligation to sign leases and other instruments regarding the income from this property? A. The widow. Q. If an agent were hired to manage the property, who would be the principal? A. The widow. On cross-examination, petitioner's witness testified that a father could not completely disinherit a child, who would in any event be entitled to a "compulsory part." He was asked: Let us assume * * * a widow and a child who has reached his majority - he has been fully maintained, fully brought up. Is he entitled to any of the income from this compulsory part? THE WITNESS: If he is fully supported and maintained by the mother he is not entitled. THE COURT: He has reached his majority. Let us say he is twenty-four years old. Does his mother still have to support him? THE WITNESS: No, no. THE COURT: Let us assume he is past twenty-four years old but his mother is still alive. Is he entitled to any of this income from the compulsory part? THE WITNESS: He could go to ask the Court to restrict the widow's right. * * *
THE COURT: Assume he was twenty-four but assume the widow is still alive; assume there was property that was being rented. Let us assume, if you want, he was in the Army. Would he be entitled, without any restriction, to any part of that income? THE WITNESS: Your Honor, he had right only to go to restrict the widow's right? It is stipulated, moreover, that "[said] 'widow's rights' * * * may be restricted by judicial decision upon the demand of the distributees to a portion of the assets belonging to the estate, provided that income from such portion of the assets will be sufficient for the proper maintenance of the surviving spouse" and that "[under] Hungarian law the owner of property subject to a usufruct has no right to any rental income received from such property nor is such person responsible for the expenses of upkeep and repairs to such property [and] [any] rental income and the responsibility for upkeep and repairs belongs to the widow entitled to the usufruct."↩
2. Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930), modifying 11 B.T.A. 743↩ (1928).