Paul H. Schweitzer and Friedel Schweitzer v. Commissioner.
Schweitzer v. Commissioner
Docket No. 4705-63.
United States Tax Court
T.C. Memo 1965-308; 1965 Tax Ct. Memo LEXIS 21; 24 T.C.M. (CCH) 1705; T.C.M. (RIA) 65308; November 30, 1965
*21 Petitioner Paul H. Schweitzer, a Hungarian by birth but an American citizen by naturalization, sustained certain losses in 1949 and 1952 because of the confiscation, without compensation, of certain of his properties in those years by the Hungarian Communist Government. Held, the facts do not show that in the years that the confiscations occurred there was any reasonable prospect that petitioner would recover his losses in some future year. Hence, petitioner's losses were deductible in the years that the confiscations took place and petitioner is not entitled to take such deductions in 1959. Gabriel T. Pap, for the petitioners. Eugene S. Linett, for the respondent. BLACK has determined a deficiency in the income tax of petitioners for the calendar year 1959 in the amount of $2,969.24. The deficiency is due to the disallowance of a deduction taken on the joint income tax return of petitioners for the year 1959 as follows: "(a) Bad debts $10,084.32." This adjustment is explained in the deficiency notice as follows: (a) The amount of $10,084.32 claimed on your income tax return for the year 1959 as "Bad Debts" has been disallowed, since you have neither established the amount of such loss nor that any allowable loss was sustained in the year 1959. Petitioners assigned error to the determination of the Commissioner as follows: (a) The Commissioner has erroneously determined that our loss *23 consisted of a bad debt. (b) The Commissioner has erroneously stated that we did not establish the amount of our loss. (c) The Commissioner has erroneously stated that the amount of our [claimed] loss was $10,084.32. (d) The Commissioner has erroneously determined that we did not establish that any allowable loss was sustained in the year 1959. At the hearing a stipulation of facts, together with exhibits attached thereto, was filed and is incorporated herein by this reference. There was also some oral testimony. From the stipulation of facts and the exhibits attached and the oral testimony we make the following findings of fact: Findings of Fact The petitioners are individuals, husband and wife, residing at State College, Pa. Their joint income tax return for the taxable year 1959 was timely filed with the district director of internal revenue at Scranton, Pa.
Paul H. Schweitzer, hereinafter called petitioner, was born in Hungary in 1893, emigrated to the United States in 1920, and became a naturalized American citizen on August 31, 1925. At all material times thereafter petitioner was an American citizen and resident. In 1949, pursuant to Decree No. 20 of the Praesidium *24 of the Hungarian People's Republic issued December 28, 1949, Hungary effected a confiscation without compensation of the following firms: (1) Motor es Autokellek, R.T., a corporation located at 11 Jokai utca, Budapest, Hungary. Petitioner, at such time, owned 600 shares (40 percent) of the outstanding stock of this corporation. Petitioner acquired 300 shares by purchase upon the organization of the corporation in 1929 and he acquired the additional 300 shares by inheritance from his father, Henry Schweitzer, who died on December 17, 1944. The outstanding stock of the corporation was at all material times closely held. (2) Henrik Schweitzer, located at 11 Jokai utca, Budapest, Hungary, and engaged in the business of selling bicycles and sewing machines at wholesale. Petitioner, at such time, owned an 18.75 percent interest in this firm which he acquired by inheritance from his father. (3) Schweitzer, Pinter and Co., located at 49 Thokoly ut, Budapest, Hungary, and engaged in the business of manufacturing bicycles and motorcycles. Petitioner, at such time, owned an 18.75 percent interest in this firm which he acquired by inheritance from his father. In 1952, pursuant to Decree *25 No. 4 of the Praesidium of the Hungarian People's Republic issued February 17, 1952, Hungary effected a confiscation without compensation of certain real property known as 49 Thokoly ut, Budapest, Hungary. Petitioner, at such time, owned a 25 percent interest in this real property which he acquired by inheritance from his father. When petitioner emigrated in 1920 he appointed his brother, Bela Schweitzer, a resident of Hungary, as his agent to manage and maintain all Hungarian property then owned by petitioner and any acquired thereafter. On January 20, 1945, the United States entered into an armistice agreement with the Provisional National Government of Hungary. As of January 20, 1945, Bela Schweitzer, acting as petitioner's agent, recovered petitioner's interest in Henrik Schweitzer; Schweitzer, Pinter and Co.; and the real property known as 49 Thokoly ut. As of January 20, 1945, Zoltan Batyka, a Hungarian attorney-at-law acting as petitioner's agent, recovered petitioner's stock in Motor es Autokellek, R.T. In July 1957, petitioner filed a claim with respect to the above-named properties, nationalized by Hungary in 1949 and 1952, under the International Claims Settlement *26 Act of 1949, Act of March 10, 1950, 64 Stat. 13, 22 U.S.C. sec. 1621, et seq. Petitioner's claim was made under section 303 of the Act, which was added by the Act of August 9, 1955, ch. 645, sec. 3, 69 Stat. 562, 571, 22 U.S.C. sec. 1641b. On April 13, 1959, the Foreign Claims Settlement Commission of the United States, acting under the authority of said Act, issued a proposed decision in response to petitioner's claim, which proposed decision became final shortly thereafter in 1959. In 1959, petitioner received payments on the award made in the above-named decision in the total amount of $1,069.42. On their joint income tax return filed for 1959, petitioners claimed a bad debt on account of the confiscation of the abovenamed properties in the amount of $10,084.32. On April 8, 1963, petitioners filed a claim for refund with respect to the taxable year 1959 in which petitioners claimed that as a result of the confiscation of the abovenamed properties they had sustained a loss in the amount of $119,566.33, and a net operating loss for 1959 in the amount of $98,236.85. The claim was for a refund in the amount of $1,837.77. As a result *27 of the alleged net operating loss sustained for 1959, petitioners on April 8, 1963, filed claims for refund for the taxable years 1956, 1957, and 1958 in the respective amounts of $3,079.88, $3,521.49, and $5,235.58. The parties are agreed that the exchange rate between Hungarian and American dollars as of December 17, 1944, is as found by the Tax Court in Abel Louis Lajtha, T.C. Memo. 1961-273, 20 TCM 1426. Petitioners never claimed any deductions for war losses under section 127 of the 1939 Code. At the date of the death of petitioner's father, Henry Schweitzer, December 17, 1944, about 75 or 80 percent of the areas of the house, 49 Thokoly Ut, Budapest, Hungary, was occupied by the factory, Schweitzer, Pinter and Co. after the factory was socialized, all of the areas of the house were allotted to different tenants. None of the tenants were dependents of petitioner. All of these "stranger tenants" paid rent to the owners until the confiscation or nationalization of the house on January 17, 1952. The house was not rented as a whole, but each apartment separately. The house had three floors. The fair market value of the house at the date of Henry's death was Hungarian *28 Pengos 100,000. The house suffered a war damage which, however, was very slight but this was repaired in 1945. The useful life of the house was 60 years from the year 1939. Petitioner acquired 300 shares of the Motor Es Autokellek, R.T. Corporation by purchase upon the organization of the corporation in 1929, and he inherited 300 shares from his father. The shares were "issued by Motor and Auto-supply Corp. Inc., Budapest 600 shares of Pengos 100.00 face value." The fair market value of the corporation at the date of Henry's death, i.e., December 17, 1944, was about Hungarian Pengos 350,000. The fair market value of the partnership, Henrik Schweitzer, at the date of Henry's death December 17, 1944, was about Hungarian Pengos 360,000. The fair market value of the partnership, Schweitzer, Pinter and Co., at the date of Henry's death December 17, 1944, was about Hungarian Pengos 260,000 to 300,000 in the opinion of witness Stefan Ban, and Hungarian Pengos 280,000 in the opinion of witness Bela Schweitzer. Neither petitioner's share in the house at 49 Thokoly ut, Budapest, Hungary, nor any of his shares of stock in Motor es Autokellek, R.T., nor any of his shares in the partnerships *29 Henrik Schweitzer or Schweitzer, Pinter and Co. were alienated between the date of Henry's death and their taking in the years 1949 and 1952, respectively, or abandoned. Petitioner had not been divested of his ownership rights as to any of his aforementioned properties until their nationalization on December 28, 1949, and February 17, 1952, respectively. Opinion BLACK, Judge: Petitioners state the principal issue in this proceeding to be: Whether petitioners are entitled to deduct their net operating loss in the year 1959, though they sustained said losses in 1949 and 1952 due to nationalization by the Hungarian communist government of their properties in Hungary. We have endeavored to make full findings of fact in this proceeding from the facts which were stipulated and from certain oral testimony which was received at the hearing. We do not understand that petitioner contends that in the years 1949 and 1952 he did not sustain certain losses which resulted from the confiscation by the Hungarian Communist Government of certain properties which petitioner owned in Budapest, Hungary. But it is the contention of petitioner that although he could have deducted such losses *30 in 1949 and 1952 when they were incurred he did not have to do so because there was a reasonable prospect that he would recover the amount of such losses in some future year. In making this contention petitioner relies on section 1.165-1(d)(2)(i), Income Tax Regs.[1]
*31 We have studied the record carefully in the instant case and we do not believe that in the years petitioner's properties were confiscated by the Hungarian Communist Government there was a reasonable prospect of any remuneration in some future year which would justify petitioner in postponing the deduction of his property losses in 1949 and 1952 to some future year. In Peter S. Elek, 30 T.C. 731 (1958), where the taxpayer was allowed to deduct in 1952 a loss resulting from confiscation of Hungarian property which took place in that year, we said: The respondent contends that the petitioner has not proved that the property was confiscated or that he is unable to secure compensation from the Hungarian Government. The petitioner testified that he received word from his father that this property was confiscated. The Hungarian Decree No. 4 of 1952 issued February 17, 1952, declared nationalized certain properties, including apartment houses, and also buildings owned by capitalists. A translation of this supplied by the Department of State is in evidence. Although the decree provides that the nationalization "shall be effected against compensation," the petitioner has received *32 no compensation or offer of compensation. The taxpayer is not required "to be an incorrigible optimist." United States v. White Dental Mfg. Co., 274 U.S. 398 (1927). The attititude of the present Hungarian Government toward its own nationals offers little reason to hope that compensation will be forthcoming from it. It will be noted that taxpayer's property in the Peter S. Elek case was confiscated by the Hungarian Government under Decree No. 4 of 1952 which is the same decree under which petitioner's apartment building was confiscated in 1952. It seems to us that there can be no doubt but that the loss occurred in 1952 as we held in the Elek case. We think that in 1949 when the personal property was confiscated by the Hungarian Government and in 1952 when the apartment property was confiscated there was but little, if any, prospect that petitioner would ever receive compensation for the properties confiscated. Certainly, we do not think that we could find from the facts which are in the record that there was "a reasonable prospect of recovery" as required by section 1.165-1(d)(2)(i), Income Tax Regs., if the losses are to be carried forward *33 to some future year and taken as losses in such year. As we said in Peter S. Elek, supra, which involved confiscation that occurred in 1952 "The attitude of the present Hungarian Government, toward its own nationals offers little reason to hope that compensation will be forthcoming from it." As we have already said, we are unable to make a finding of fact from the record in the instant case that in either the year 1949 when the personal property was confiscated or in 1952 when the apartment house property was confiscated petitioner had a reasonable prospect that he would recover his losses in some future year. It is true that on August 9, 1955, the International Claims Settlement Act of 1949 was amended by the U.S. Congress to enable Hungarian nationals to file claims for their losses with the Foreign Claims Settlement Commission. Section 303 of that amended Act is printed in the margin. [2] Up to the time of the amendment of August 9, 1955, Hungarians had not been included in the International Claims Settlement Act of 1949. *34 It has been stipulated by the parties that - 14. In July 1957, petitioner filed a claim with respect to the above-named properties, nationalized by Hungary in 1949 and 1952, under the International Claims Settlement Act of 1949, as amended. * * * Petitioner's claim was made under Section 303 of the Act, which was added by the Act of August 9, 1955. On April 13, 1959, the Foreign Claims Settlement Commission of the United States, acting under the authority of said Act, issued a proposed decision in response to petitioner's claim, which proposed decision became final shortly thereafter in 1959. * * *
15. In 1959, petitioner received payments on the award * * * in the total amount of $1,069.42. It seems to us that the above stipulated facts showing that petitioner did file a claim with the Foreign Claims Settlement Commission under the amended Act of August 9, 1955, for recovery of his war losses which were incurred in 1949 and 1952 and was awarded and paid $1,069.42 has nothing to do with the issue which we have here to decide - it is irrelevant to the determination when the losses were incurred. We sustain the determination of the Commissioner. Decision will be entered *35 for the respondent. Footnotes
1. Sec. 165-1(d)(2)(i). If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances. Whether or not such reimbursement will be received may be ascertained with reasonable certainty, for example, by a settlement of the claim, by an adjudication of the claim, or by an abandonment of the claim. When a taxpayer claims that the taxable year in which a loss is sustained is fixed by his abandonment of the claim for reimbursement, he must be able to produce objective evidence of his having abandoned the claim, such as the execution of a release.↩
2. Sec. 303. The Commission shall receive and determine in accordance with applicable substantive law, including international law, the validity and amounts of claims of nationals of the United States against the Governments of Bulgaria, Hungary, and Rumania, or any of them, arising out of the failure to - (1) restore or pay compensation for property of nationals of the United States as required by article 23 of the treaty of peace with Bulgaria, articles 26 and 27 of the treaty of peace with Hungary, and articles 24 and 25 of the treaty of peace with Rumania. Awards under this paragraph shall be in amounts not to exceed two-thirds of the loss or damage actually sustained; (2) pay effective compensation for the nationalization, compulsory liquidation, or other taking, prior to the effective date of this title, of property of nationals of the United States in Bulgaria, Hungary, and Rumania; and (3) meet obligations expressed in currency of the United States arising out of contractual or other rights acquired by nationals of the United States prior to April 24, 1941, in the case of Bulgaria, and prior to September 1, 1939, in the case of Hungary and Rumania, and which became payable prior to September 15, 1947.↩