Andrew Major and Theresa Major v. Commissioner.
Major v. Commissioner
Docket No. 3037-64.
United States Tax Court
T.C. Memo 1969-69; 1969 Tax Ct. Memo LEXIS 225; 28 T.C.M. (CCH) 386; T.C.M. (RIA) 69069; April 14, 1969, Filed Gabriel T. Pap, for the petitioners. Wallace Musoff, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined a deficiency of $2,203.47 in petitioners' income tax for the year 1961. The sole issue for our determination is whether petitioners are entitled to a loss deduction in 1961 pursuant to section 165, [1] which loss resulted from the nationalization by the Hungarian government in 1948 and 1952 of real and personal property belonging to petitioner Andrew Major. *226 Findings of Fact Some of the facts are stipulated and are found accordingly. Petitioners are husband and wife who had their legal residence in Rye, New York, at the time of filing the petition herein. They filed a joint Federal income tax return for the year 1961 with the district director of internal revenue, Manhattan, New York. Theresa Major is a party hereto only because she filed such return with her husband. Reference to petitioner shall be deemed to refer only to petitioner Andrew Major. Petitioner was born in Budapest, Hungary, in 1921. He left Hungary in June 1939, entered the United States in September 1941, and became an American citizen in December 1943. Petitioner acquired ownership interests in certain real property and stock by inheritance from his father on February 9, 1945. The real property consisted of an apartment house located at 13 Kossuth Lajos Street, Budapest, Hungary, in which petitioner owned a 50 percent interest. The property was nationalized by the Government of Hungary without compensation in 1952 pursuant to Decree No. 4. The stock ownership *227 consisted of a 25 percent interest in each of Magyar Konfekeiomuvek R.T. (hereinafter "Konfecta"), Fekeiomuvek R.T. (hereinafter "Konfecta"), a closely held Hungarian corporation engaged in the manufacture of fur coats, and Helvetia Epito es Ingatlan R.T. (hereinafter "Helvetia"), a Hungarian corporation engaged in the real estate business. Both corporations were nationalized by the Government of Hungary without compensation to the shareholders in 1948. Petitioner retained ownership of the aforementioned property interests until their nationalization. The United States entered into an armistice agreement with the Provisional National Government of Hungary on January 20, 1945. A Treaty of Peace was concluded between Hungary and the Allied and Associated powers in 1947. In September 1956, petitioner filed a claim with respect to the property nationalized in 1948 and 1952 with the Foreign Claims Settlement Commission (hereinafter the Commission), as allowed by the International Claims Settlement Act of 1949, Act of March 10, 1950, 64 Stat. 13, 22 U.S.C. sec. 1621, et seq. Petitioner's claim was made under section 303(2) of the Act, which section was added *228 by the Act of August 9, 1955, ch. 645, sec. 3, 69 Stat. 562, 571, 22 U.S.C., sec. 1641b. In March 1959, the Commission, acting under the authority of the aforementioned Act, issued a proposed 387 decision with respect to petitioner's claim, which shortly thereafter became a final decision. Petitioner received payments pursuant to this award in the amount of $1,000.00 in 1959, and $2,162.77 in 1961. On his 1961 return, he took a deduction which he characterized as "net operating loss deduction" for $240,845.07, representing the difference between $244,007.84, which he claimed to be the "Value of my lost properties," less the aggregate payments received of $3,162.77. [2]
OPINION Petitioner claimed a deduction of $240,845.07 on his 1961 income tax return, resulting from the nationalization *229 of certain real and personal property by the Hungarian government in 1948 and 1952. The major issue is whether 1961 is the proper year to claim the deduction pursuant to section 165. [3] Respondent, conceding that petitioner suffered losses through the nationalizations, takes the position that they were sustained in 1948 with respect to the stock and 1952 with respect to the apartment building. Petitioner contends that, although the losses occurred in 1948 and 1952, they were not "sustained" until 1961, because a "reasonable prospect" of recovery existed [4] *230 until receipt of the final payment [5] from the Commission in that year. He argues that a "reasonable prospect of recovery" stemmed, first, from a possibility of the application of Hungarian assets within the United States to his claim and, second, from an expectation that the Hungarian government would recompense the owners of nationalized assets. Petitioner supports his first contention by reference *231 to Article 29 of the Treaty of Peace with Hungary, [6] which empowered the United States to seize assets in the United States belonging to Hungary or Hungarian nationals and to apply those assets to claims of American nationals against Hungary or its nationals. The treaty was nothing more than an authorization for the Government of the United States to act with respect to Hungarian assets within the United States. No operative mechanism to implement the treaty through a claims commission or otherwise existed at the time of either of the nationalizations in question. Consequently, as far as the United States is concerned, petitioner had only a hope or expectancy, based at best upon a moral obligation in his favor. Schweitzer v. Commissioner, 376 F. 2d 30 (C.A. 3, 1967), affirming per curiam a Memorandum Opinion of this Court; cf. Estate of Zinaida Bary v. Commissioner, 368 F. 2d 844 (C.A. 2, 1966), affirming a Memorandum Opinion of this Court; Harry J. Colish, 48 T.C. 711 (1967). Clearly, in this respect, the requirement of a "reasonable prospect of recovery" is not satisfied. *232 Petitioner's alternative contention that there was such a prospect in respect of the Hungarian government is equally without 388 foundation on this record. As we noted in Peter S. Elek, 30 T.C. 731 (1958), which involved the same decree under which petitioner's apartment house was nationalized - Although the decree provides that the nationalization "shall be effected against compensation," the petitioner has received no compensation or offer of compensation. The taxpayer is not required "to be an incorrigible optimist." United States v. White Dental Mfg. Co., 274 U.S. 398 (1927). The attitude of the present Hungarian Government toward its own nationals offers little reason to hope that compensation will be forthcoming from it. See 30 T.C. at p. 734. We find this case indistinguishable from Schweitzer v. Commissioner, supra, where comparable Hungarian decrees were involved and it was determined that the losses incurred were deductible in the years of nationalization and not in 1959 when the taxpayer received an award and payment thereon from the Commission. Louisa B. Gunther Farcasanu, 50 T.C. 881 (1968), *233 does not, as petitioner urges, impliedly reject the holdings of Colish, supra, and Schweitzer, supra. In that case, the issue was whether the taxpayer had ever suffered a deductible loss, [7] not, as is the case herein, in which year a conceded loss was deductible. Having found that no such loss had occurred, we held that the taxpayer's basis in the property continued and should be offset against the recovery from the Commission.
In short, we think this case is controlled by Schweitzer, Colish, and Elek, supra. The eye of petitioner's distinguishing needle is simply too small to thread. Petitioner's loss was sustained prior to the taxable year in question. As a consequence of this holding, we need not determine the type and amount of the loss which petitioner otherwise would have been entitled to deduct. Decision will be entered under Rule 50. Footnotes
1. All references, unless otherwise specified, are to the Internal Revenue Code of 1954, as amended.↩
2. Included in the schedule of "lost properties" were certain stock interests, other than those in Konfecta and Helvetia, as to which petitioner has abandoned any claimed deduction. Respondent makes no claim that, in the event we disallow petitioner's claimed deduction, the $2,162.77 received by petitioner during the taxable year in question constitutes taxable income.↩
3. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. * * *↩
4. Sec. 1.165-1(d)(2)(i), Income Tax Regs.: If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances. * * * ↩
5. No argument was presented that the 1961 payment did not represent a "final" payment.↩
6. Treaty of Peace with Hungary (1947): Article 29. Paragraph 1. Each of the Allied and Associated Powers shall have the right to seize, retain, liquidate or take any other action with respect to all property, rights and interests which at the coming into force of the present Treaty are within its territory and belong to Hungary or to Hungarian nationals, and to apply such property or the proceeds thereof to such purposes as it may desire, within the limits of its claims and those of its nationals against Hungary or Hungarian nationals, including debts, other than claims fully satisfied under other Articles of the present Treaty. All Hungarian property, or the proceeds thereof, in excess of the amount of such claims, shall be returned.↩
7. The sole basis for the claimed loss was "theft" under section 165(c)(3). Petitioner specifically abjured any attempt so to narrow the limits of his rights to a deduction herein.↩